**John E. WALRATH, Plaintiff,**

v.

**UNITED STATES of America; Carol Pavilack Getty, Regional U.S. Parole Commissioner, in her individual capacity; Carol Wilson Muller, U.S. Parole Commission, Senior Case Analyst, in her individual capacity; Michael Stover, General Counsel for U.S. Parole Commission, in his individual capacity; John Magnuson, Case Analyst for U.S. Parole Commission, in his individual capacity, Defendants.**

**No. 93 C 3984.**

United States District Court, N.D. Illinois, E.D.

Nov. 24, 1ᶜ

Daniel S. Alexander, Arnold & Alexander, Ltd., Chicago, IL, for plaintiff.

Jonathan C. Haile, U.S. Attys. Office, Chicago, IL, for defendants.

MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff John E. Walrath ("Walrath") brings this complaint against the United States, Carol Getty ("Getty"), the Regional United States Parole Commissioner, Carol Muller ("Muller"), an analyst for the United States Parole Commission ("USPC"), Michael Stover ("Stover"), General Counsel for the USPC, and John Magnuson ("Magnuson"), a case analyst for the USPC, alleging various violation of his constitutional rights. Presently before us are the individual defendants' motion to dismiss. For the following reasons, we grant the motion.

### I. Factual Background[1]

On October 13, 1970, a jury convicted Walrath of kidnapping and sexually molesting a six year old boy. Three men observed Walrath trying to drown the child in Lake Michigan, and Walrath was captured shortly thereafter.

Having been sentenced to 35 years of imprisonment in 1971, Walrath was first paroled in 1983. His parole was revoked five years later when he was caught stealing and resisted arrest. On May 8, 1992, Walrath was paroled for the second time. The revocation of this parole provides the fodder for Walrath's current complaint.

As a special condition of Walrath's parole, he was to receive ongoing mental health aftercare. Certain of the programs targeted for Walrath required use of a polygraph and a penile plethysmograph during diagnosis or treatment.[2] The prospect of these tests troubled Walrath, and sometime in the fall of 1992, Terry Childers, Walrath's probation officer, informed Walrath that he would not be required to undergo a polygraph or penile plethysmograph without further clarification from the USPC. In response, Walrath let the USPC know that he was prepared to comply with any parole conditions, provided

---

1. We will, of course, take all the complaint's well-pleaded allegations as true and will draw all reasonable inferences in favor of the plaintiff. *Balaboanos v. North Am. Invest. Group, Ltd.*, 708 F.Supp. 1488, 1491 n. 1 (N.D.Ill.1988) (citing *Ellswort v. City of Racine*, 774 F.2d 182, 184 (7th Cir.1985), *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986)).

2. A penile plethysmograph is a test designed to measure a patient's patterns of sexual arousal. To assess patient reactions to various audial and visual stimuli, a gauge is attached around the circumference of the patient's penis.

he be permitted to seek judicial review of any requirements he believed violated his constitutional rights.

On July 25, 1992 Childers visited Walrath at his home to discuss his aftercare. During the call, Walrath became agitated. His face grew red and he started to gesticulate angrily. Feeling nervous, Childers got into his car and started to leave. According to Childers' report, Walrath climbed onto the vehicle to prevent him from leaving. After heeding Childers' instruction to get off, Walrath took to his own car and followed Childers for several miles before turning around and going home.

Following this incident, Childers filed a report with the USPC. Notably, he did not request that Walrath's parole be revoked. Instead, he simply wanted to record the events. Based on the report, however, and on word that Walrath had failed to comply with the penile plethysmograph at the Midwest Family Resource Center, the USPC issued a warrant for Walrath's arrest signed by Muller, a senior case analyst. Charge One of the arrest warrant alleged that Walrath had violated the mental health condition of his parole, while Charge Two alleged that Walrath had attempted to assault Childers. On September 4, United States Marshals arrested Walrath at his home in the early morning hours.

Upon arrest, Walrath was taken to the Metropolitan Correctional Center ("MCC") where he was incarcerated from September 4 to March 4, 1992. From March 4 to April 26, 1993, Walrath was held at a halfway house. A preliminary hearing to determine whether there was probable cause to arrest Walrath was held on September 14, 1992. At the hearing, Childers corroborated Walrath's assertion that he intended to comply with aftercare conditions. Accordingly, USPC hearing officer Ronald Kumke found no probable cause for Charge One. Subsequently, Getty and Magnuson overrode Kumke, finding that probable cause existed for Charge One, warranting continued incarceration for Walrath on this offense.

As for Charge Two, Childers testified that he had not felt threatened by Walrath and that he had not sought an arrest warrant. It is not clear from Walrath's complaint, however, or from the record, whether Kumke found probable cause for Charge Two. Instead, it is apparent that Charge Two of the arrest warrant was amended, charging Walrath with threatening to assault Childers.

On November 14, 1992, Walrath filed a petition for habeas corpus relief pursuant to 28 U.S.C. § 2241.[3] Walrath alleges that in retaliation for filing this petition, the USPC postponed his revocation hearing until December 9, 1992, when it was held before two USPC officers. The officers found no basis for Charge One and downgraded Charge Two of the arrest. In its Notice of Action, the USPC stated as follows:

> [A]t no time did you physically or verbally assault your U.S.P.O. Moreover, you adjusted acceptedly and apparently fully intended to comply with your parole conditions.

Based on these findings, the officers recommended that Walrath be held in custody for six months for disorderly conduct, an offense with which Walrath had not been charged and for which he presented no defense.

In the wake of this hearing, Stover, General Counsel for the USPC, wrote a memo recommending a Special Reconsideration hearing be held for Walrath. Stover's concern, forwarded to Getty by John Magnuson, a USPC case analyst, was that the alleged incident did not meet the statutory requirements for disorderly conduct and that, in any event, Walrath had been given insufficient notice of the charge. Getty concurred with the recommendation, and a second hearing was held in late February.

At this reconsideration hearing, Walrath was charged with threatening to assault a protected person. During the hearing, Walrath's attorney informed the presiding officers that he had not been notified of the amended charge. Moreover, in protest of the irregular proceedings, counsel indicated

---

**3.** Walrath voluntarily dismissed this petition following his release from the halfway house on April 26, 1993.

that he had advised Walrath not to participate in the hearing. Walrath, apparently agreeing with his attorney's advice, refused to cooperate.

After noting the above, the hearing commenced and the panel, made up of different USPC officers, once again found that Walrath had not violated any conditions of parole. In fact, the panel stated that inclusion of Charge One after the previous hearing was in error. Significantly, the panel also found insufficient evidence to support the charge of threatening to assault. As a consequence of this hearing, the USPC issued an expedited order directing Walrath's release. On February 25, 1993, Walrath asked the USPC to release him immediately on bond, pending the finalization of the release order. When the USPC rejected this request, Walrath moved the federal judge presiding over his habeas petition to order his release. The next day, Getty vetoed the USPC's order, indicating that sufficient evidence existed that Walrath had implicitly threatened to assault Childers. Accordingly, Getty issued a new order instructing Walrath's parole be revoked and that he be held in custody for up to 180 days. Walrath alleges that Stover and others conferred and concurred in this action, which he maintains was intended to cover-up earlier civil rights violations.

## II.  Discussion

■ The individual defendants now seek to dismiss this action for lack of personal jurisdiction, absolute immunity, and failure to state a claim. We turn first to the defendants' claim that they enjoy absolute immunity from suit in this matter.

■ The doctrine of absolute immunity shields public officials from personal liability for certain actions taken in their official capacity. Generally, judicial officers and others performing quasi-judicial functions possess absolute immunity. However, absolute immunity protects only truly adjudicative acts, rather than merely administrative or investigative tasks.[4] *Forrester v. White,* 484

U.S. 219, 227, 108 S.Ct. 538, 544, 98 L.Ed.2d 555 (1988).

■ The Seventh Circuit has consistently ruled that parole boards are functionally equivalent to the judiciary. *See, e.g., Thompson v. Duke,* 882 F.2d 1180 (7th Cir.1989), *cert. denied,* 495 U.S. 929, 110 S.Ct. 2167, 109 L.Ed.2d 496 (1990); *Walker v. Prisoner Review Board,* 769 F.2d 396 (7th Cir.1985) (reiterating that parole board is functionally comparable to judiciary), *cert. denied,* 474 U.S. 1065, 106 S.Ct. 817, 88 L.Ed.2d 791 (1986); *Trotter v. Klincar,* 748 F.2d 1177 (7th Cir. 1984) (absolute immunity extends to activities associated with parole board's decision to revoke parole, including decision not to hold a second revocation hearing); *United States ex rel. Powell v. Irving,* 684 F.2d 494 (7th Cir.1982) (parole board official's review of parole application protected by absolute immunity.) Thus, as an arm of the sentencing judge, parole board decisions to grant, deny, or revoke parole fall within the ambit of absolute immunity.[5] Indeed, according to the Seventh Circuit, given the parole board's essentially judicial purpose, adjudicative functions of the parole board

> include not only the actual decision to revoke parole, but also the activities that are part and parcel of the decision process. All the actions contested here are inexorably connected with the execution of parole revocation procedures and are analogous to judicial action relating to the conduct of trial proceedings and to ruling on motions of counsel. .

*Trotter v. Klincar,* 748 F.2d 1177, 1182 (7th Cir.1984) (citation omitted).

In reaching these decisions, the Seventh Circuit was mindful of the Supreme Court's instruction that adjudicatory, rather than administrative, tasks are protected by absolute immunity. However, rather than parsing each activity undertaken by parole boards, the Seventh Circuit concluded that, like the judiciary, all tasks of parole boards relate to

---

4.  The Supreme Court has noted that "immunity is justified by the *functions* it protects and serves, not the person to whom it attaches." *Forrester,* 484 U.S. at 227, 108 S.Ct. at 544 (emphasis in the original).

5.  Because courts have employed similar reasoning in the application of absolute immunity in both § 1983 and *Bivens* cases, we rely on both lines of precedent here.

their adjudicatory function. *See, e.g., Walker*, 769 F.2d at 398 (declining to follow Third Circuit's example in distinguishing between a board's adjudicatory and administrative actions). To be sure, a more limited scope of absolute immunity would subject parole boards, like judges themselves, to endless litigation directed at defining the boundaries of "judicial" acts. *See Thompson*, 882 F.2d at 1185–86; *Walker*, 769 F.2d at 399. In turn, parole boards and judges would be motivated to avoid retaliatory litigation, rather than to make difficult, sometimes unpopular decisions. *Thompson*, 882 F.2d at 1185–86. ("It is sufficient to say that judicial decision-making without absolute immunity would be driven by fear of litigation and personal monetary liability.").

Despite Walrath's assertions to the contrary, recent Supreme Court decisions do not cast doubt on the Seventh Circuit's understanding of absolute immunity. Walrath's suggestion that the Seventh Circuit has failed to appreciate the "functional analysis" as set forth by the Supreme Court is unfounded. In support of his claim, Walrath cites to *Burns v. Reed*, 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) and to *Buckley v. Fitzsimmons*, —— U.S. ——, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), in which the Supreme Court reversed the Seventh Circuit's grant of absolute immunity to prosecutors. In *Burns*, the Court noted that "most Courts of Appeals have held that prosecutors are not entitled to absolute immunity for 'investigative' or 'administrative' acts," but observed that the courts "have differed in where they draw the line between protected and unprotected activities." *Burns*, 500 U.S. at ——, 111 S.Ct. at 1938. Quite expressly, then, these decisions were intended to clarify the boundaries of *prosecutorial* immunity.

Unlike parole board members and officers, however, the Seventh Circuit has never held that a government attorney's job, in its entirety, is functionally comparable to the judiciary. Instead, in recognition of the wide-ranging roles performed by prosecutors and other public counsel, the Seventh Circuit has routinely distinguished between adjudicatory, investigative, and executive tasks in determining whether absolute immunity applies to challenged conduct. *See, e.g., Auriemma v. Montgomery*, 860 F.2d 273 (7th Cir.1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989); *Houston v. Partee*, 978 F.2d 362 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1647, 123 L.Ed.2d 269 (1993). Rather than exposing any legal deficiency, then, the Seventh Circuit's analysis of immunity as it pertains to parole boards simply reflects this circuit's assessment that, as opposed to other public officials, parole board members and officers engage virtually exclusively in quasi-judicial activities. We are thus unpersuaded by Walrath's contention that Seventh Circuit precedent in the area of absolute immunity is suspect.

In his complaint, Walrath challenges the USPC's issuance of an arrest warrant based on a perceived violation of parole, its decision to delay the revocation hearing, and its ultimate revocation of his parole—an action that was purportedly contrived to cover up other constitutional violations committed during the course of proceedings against Walrath. Each of these actions involve, or are closely and inextricably tied to, the USPC's central adjudicative task of determining whether Walrath's parole should properly be rescinded. *See Trotter*, 748 F.2d at 1182. *See also Thompson*, 882 F.2d at 1185 (absolute immunity attaches to parole board's scheduling decisions). Absolute immunity thus precludes Walrath's suit against the individual defendants.[6]

### III. Conclusion

For the foregoing reasons, we dismiss the complaint against the individual defendants. It is so ordered.

---

6. Having found that absolute immunity precludes suit against the individual defendants, we need not address further arguments for dismissal.