35 F.3d 277
 John E. WALRATH, Plaintiff-Appellant,
v.
UNITED STATES of America, Carol P. Getty, Regional U.S.
Parole Commissioner, in her individual capacity, Carol W.
Muller, U.S. Parole Commission, Senior Case Analyst, in her
individual capacity, Michael Stover and John Magnuson,
Defendants-Appellees.
 No. 93-3953.
 United States Court of Appeals,
Seventh Circuit.
 Argued July 6, 1994.
Decided Sept. 8, 1994.
 
 Daniel S. Alexander, Patrick E. Boyle (argued), Arnold & Alexander, Chicago, IL, for John E. Walrath.
 Jonathan Haile (argued), Office of U.S. Atty., Civ. Div., Chicago, IL, for defendants-appellees.
 Before BAUER, COFFEY and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 John E. Walrath filed a complaint pursuant to Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), in which he alleged that the United States, Carol Pavilack Getty, Carol Wilson Muller, Michael Stover, and John Magnuson had violated his constitutional rights by causing his parole to be revoked. Walrath further alleged that the defendants conspired to retaliate against him for seeking to vindicate his constitutional rights, fabricated false charges in order to conceal the fact that his incarceration was illegal, and imposed certain conditions of parole which infringed upon his right to privacy and caused him severe mental anguish. The district court denied Walrath's request for injunctive relief against the United States, then dismissed his suit for monetary damages against the individual defendants on the ground that they are entitled to absolute immunity. This appeal concerns the immunity of the individual defendants from Walrath's claim for damages.I. FACTS
 
 
 2
 On October 13, 1970, John Walrath was convicted in federal court of kidnapping a six-year-old boy. According to Walrath's presentence report, he abducted the child in Chicago, Illinois, sexually molested him, then took him to Hart, Michigan. Three men who observed Walrath attempting to drown the young boy in Lake Michigan intervened and were able to rescue him. On February 19, 1971, Walrath was sentenced to 35 years in prison. He was released on parole in 1983. His parole was revoked in late 1990 after he was convicted of retail theft and resisting arrest, and had failed to report the arrest and conviction to his parole officer. On May 8, 1992, Walrath was paroled for a second time. The circumstances surrounding the revocation of his second parole led to this Bivens action.
 
 
 3
 As a special condition of Walrath's parole, he was required to participate in a mental health treatment program as directed by his probation officer, Terry Childers. Childers first referred Walrath to the Midwest Family Resources Associates, Ltd., in Oak Park, Illinois, for an evaluation. Following a series of interviews, Midwest Family Resources informed Childers that Walrath had been reluctant to discuss his sexual history, and that a clinical polygraph examination and a penile plethysmograph to measure Walrath's patterns of sexual arousal would be necessary to complete the evaluation. Walrath agreed to continue counseling, but refused to undergo any invasive tests.
 
 
 4
 On July 25, 1992, Childers visited Walrath at his apartment to discuss his mental health evaluation. When the discussion turned to the proposed tests, Walrath became agitated. Childers felt it would be wise to end the interview, and left the apartment. He was met in the lobby by Walrath, who continued to argue about the evaluation. Walrath then climbed onto Childers' automobile, preventing him from leaving. After being told repeatedly to get off the car, Walrath finally did so, but then took his own car and followed Childers for more than a mile before returning home. Childers reported the incident to the United States Parole Commission (USPC). Although Childers did not recommend that a parole violator warrant issue, upon a review of Childers' report and the information from Midwest Family Resources, Senior Case Analyst Carol Wilson Muller caused a warrant to issue for Walrath's arrest. The allegations were that Walrath had violated the special conditions of his parole (Charge One), and that he had attempted to assault Childers (Charge Two). On September 4, 1992, Walrath was arrested at his home and taken to the Metropolitan Correctional Center, where he remained until March 4, 1993. From March 4, 1993, until April 26, 1993, Walrath was held in custody at a halfway house.
 
 
 5
 A preliminary hearing was held by the USPC on September 14, 1992, to determine whether Walrath's arrest had been supported by probable cause. At the hearing, Childers stated that prior to Walrath's arrest, he had informed Walrath that he would not be required to submit to a polygraph examination or a penile plethysmograph simply on the word of Midwest Family Resources, without further clarification from the USPC. Walrath, in turn, agreed to comply with the mental health aftercare conditions of his parole, provided that he be allowed to seek judicial review of any requirements that he believed violated his constitutional rights. USPC Hearing Officer Ronald Kumke accordingly found no probable cause for Charge One.
 
 
 6
 Regional United States Parole Commissioner Carol Pavilack Getty and Case Analyst John Magnuson overrode Kumke's recommendation, and ordered that Walrath be held on Charge One. Concerning Charge Two, Childers testified that he had not felt threatened by Walrath's behavior on July 25, 1992, nor had he believed there was any need to request a parole violator warrant. As the district court observed, it is unclear whether Kumke found probable cause to hold Walrath on Charge Two. Instead, it is apparent that at some point Charge Two was amended to state that Walrath had threatened to assault Childers.
 
 
 7
 On November 13, 1992, Walrath filed a petition for a writ of habeas corpus, 28 U.S.C. Sec. 2241, in federal court. A parole revocation hearing was held on December 9, 1992, before two hearing officers of the USPC. Following the hearing, the officers found that there was no basis for Charge One, and that Charge Two should be downgraded to the offense of disorderly conduct. The officers further recommended that Walrath be held in custody for six months on the basis of the disorderly conduct charge. Walrath, through his attorney, informed the hearing officers that he had not been advised of the disorderly conduct charge, and was thus unprepared to present a defense to that charge at the hearing.
 
 
 8
 Less than one month after the revocation hearing, Michael Stover, General Counsel to the USPC, wrote a memorandum to Magnuson recommending that a special reconsideration hearing be held for Walrath in light of the fact that the incident involving Childers did not meet the state statutory requirements for disorderly conduct, and that in any event, Walrath had not received sufficient notice of the USPC's intention to amend the charge. Stover further recommended that the warrant be revised to charge Walrath with threatening to assault his probation officer. Magnuson advised Getty of Stover's recommendation, who concurred in setting a special reconsideration hearing for Walrath, to be held on February 25, 1993. Walrath alleges that neither he nor his attorney were notified of the new charge until the day of the special hearing, and that the hearing was merely designed to conceal the illegality of Walrath's detention.
 
 
 9
 At the February 25, 1993 hearing, Walrath's attorney advised the hearing officers that he had not received adequate notice of the new charge, and that Walrath would not participate in the hearing because of the highly irregular procedures that had been employed in his case. Relying solely on the record that had been developed during Walrath's first revocation hearing, the second panel again found that Walrath had not violated the special conditions of his parole (Charge One). The panel also determined that there was insufficient evidence to support the charge that Walrath had threatened to assault Childers (Charge Two). It accordingly recommended that Walrath's parole not be revoked, and that he be reinstated to supervision and released from custody.
 
 
 10
 The same day, the USPC issued an expedited order stating that Walrath should be released from custody forthwith, subject to special conditions of mental health after-care. Pending finalization of the expedited order, Walrath attempted to regain his liberty by posting bond. When that failed, he asked the district judge presiding over his petition for habeas corpus to order his immediate release on bond. Walrath alleges that in retaliation for his efforts to obtain his lawful release, Getty, Stover and others overrode the panel's order, and issued a new order directing that Walrath's parole be revoked and that he be held in custody for up to 180 days. Walrath further maintains that Getty and Stover invented a new charge, "implied threat to assault," in an effort to justify his further incarceration, as well as to conceal their violation of his constitutional rights.
 
 
 11
 Following his release from the halfway house, Walrath moved for voluntary dismissal of his habeas corpus petition, then filed the present civil rights complaint pursuant to Bivens. The district court denied his request for injunctive relief against the United States on July 29, 1993. Walrath does not challenge that decision. The remaining defendants moved to dismiss Walrath's action for compensatory and punitive damages on the grounds that the court was without personal jurisdiction over the defendants, that each of the defendants was entitled to absolute immunity for their decisions, and that the existence of other remedies, as well as the danger that a court-ordered remedy would interfere with the effective functioning of the USPC, precluded the court from creating a Bivens action in this case. The district court determined that the defendants were absolutely immune from civil suit for damages for their decision to revoke Walrath's parole. 842 F.Supp. 299. The court did not reach the defendants' other arguments. Walrath appeals the dismissal of his complaint on the ground of absolute immunity.
 
 II. ANALYSIS
 
 12
 Whether a government official is entitled to absolute immunity from a suit for damages depends on " 'the nature of the function performed, not the identity of the actor who performed it.' " Buckley v. Fitzsimmons, --- U.S. ----, ----, 113 S.Ct. 2606, 2613, 125 L.Ed.2d 209 (1993) (quoting Forrester v. White, 484 U.S. 219, 229, 108 S.Ct. 538, 545, 98 L.Ed.2d 555 (1988)). The grant of absolute immunity from suit has been "quite sparing," confined to official functions where the exposure to liability would invariably impede the official in the performance of his duties. Forrester, 484 U.S. at 223-24, 108 S.Ct. at 542-43; see also Butz v. Economou, 438 U.S. 478, 508-09, 98 S.Ct. 2894, 2911-12, 57 L.Ed.2d 895 (1978). Because qualified immunity is generally deemed sufficient to protect a public official from vexatious litigation, "[t]he proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity." Antoine v. Byers & Anderson, Inc., --- U.S. ----, ---- - ---- & n. 4, 113 S.Ct. 2167, 2169-70 & n. 4, 124 L.Ed.2d 391 (1993) (citing Burns v. Reed, 500 U.S. 478, 486-87, 111 S.Ct. 1934, 1939-40, 114 L.Ed.2d 547 (1991)).[1]
 
 
 13
 As the Supreme Court observed in Forrester, because adjudication so often requires a judge "to disappoint some of the most intense and ungovernable desires that people can have," judges are generally accorded absolute immunity in the performance of "truly judicial acts" within their lawful jurisdiction. 484 U.S. at 226-27, 108 S.Ct. at 543-44. The Court has also granted absolute immunity to certain other officials, such as administrative law judges, and federal and state prosecutors, in the performance of functions that are "closely associated with the judicial process." Cleavinger v. Saxner, 474 U.S. 193, 200, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985). In each case, the analysis has proceeded not from the official's rank or title, but from the nature of his responsibilities. Id. at 200-01, 106 S.Ct. at 500-01; Butz, 438 U.S. at 510-12, 98 S.Ct. at 2912-14. Thus, where the official's responsibilities are closely analogous to the adjudicative functions of a judge, or are "intimately associated" with the judicial process itself, that official has been granted absolute immunity from suit for actions taken to fulfill those particular responsibilities. See Buckley, --- U.S. at ---- - ----, 113 S.Ct. at 2614-15; Butz, 438 U.S. at 511-15, 98 S.Ct. at 2913-15; Imbler v. Pachtman, 424 U.S. 409, 430, 96 S.Ct. 984, 994, 47 L.Ed.2d 128 (1976).
 
 
 14
 Most federal courts, including the Seventh Circuit, have consistently held that parole board members are absolutely immune from suit for their decisions to grant, deny, or revoke parole. See Thompson v. Duke, 882 F.2d 1180, 1182-85 (7th Cir.1989), cert. denied, 495 U.S. 929, 110 S.Ct. 2167, 109 L.Ed.2d 496 (1990); Walker v. Prison Review Board, 769 F.2d 396, 398 (7th Cir.1985), cert. denied, 474 U.S. 1065, 106 S.Ct. 817, 88 L.Ed.2d 791 (1986); Trotter v. Klincar, 748 F.2d 1177, 1182-83 (7th Cir.1984); United States ex rel. Powell v. Irving, 684 F.2d 494, 497 (7th Cir.1982).[2] As the Ninth Circuit observed in Sellars v. Procunier, 641 F.2d 1295 (9th Cir.), cert. denied, 454 U.S. 1102, 102 S.Ct. 678, 70 L.Ed.2d 644 (1981), "[i]n deciding to grant, deny, or revoke parole, [parole board members] act in a quasi-judicial capacity, as an arm of the sentencing judge." Id. at 1301-02 n. 15 (quoting Bricker v. Michigan Parole Bd., 405 F.Supp. 1340, 1345 (E.D.Mich.1975)); see also Cleavinger, 474 U.S. at 204, 106 S.Ct. at 502.[3] By similar reasoning, this court has concluded that activities which are "inexorably connected with the execution of parole revocation procedures and are analogous to judicial action" are entitled to absolute immunity. Trotter, 748 F.2d at 1182. We have therefore held that parole board officials who declined a request to conduct a second preliminary parole revocation hearing were absolutely immune from suit. Id. at 1181-83.
 
 
 15
 The crux of the issue raised by Walrath is whether the Supreme Court's recent refinement of the functional approach to absolute immunity analysis, as applied in Buckley v. Fitzsimmons and Burns v. Reed, should change the result in this case. In Buckley, the Supreme Court held that a prosecutor is not absolutely immune from suit in the performance of administrative or investigative functions, but only when he acts as an advocate of the state. --- U.S. at ---- - ----, 113 S.Ct. at 2615-16. Thus, the prosecutor in Buckley, was not absolutely immune from suit for allegedly conspiring to fabricate evidence with which to indict the petitioner, or for statements he made to the media at a post-indictment press conference. Id. --- U.S. at ---- - ----, 113 S.Ct. at 2617-18. In Burns, the Court held that although a prosecutor was absolutely immune from suit for his actions in appearing before a judge and seeking a search warrant, 500 U.S. at 491-92, 111 S.Ct. at 1941-43, he was not entitled to absolute immunity for his advice to police officers during the investigative phase of the case. Id. at 493, 111 S.Ct. at 1943. In so holding, the Court observed that the concern for protecting the judicial process from harassment and intimidation "justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings." Id. at 494, 111 S.Ct. at 1943. The Court further observed that "it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice." Id. at 495, 111 S.Ct. at 1944. Neither Buckley nor Burns support Walrath's contention that the parole board members in this case should be denied absolute immunity for their actions.
 
 
 16
 Walrath first seeks to hold Muller liable for signing a warrant for his arrest despite the absence of probable cause to believe that he had violated his parole. The issuance of an arrest warrant has several key characteristics in common with a judicial act: it involves the exercise of discretion in applying the law to the facts of a particular case, poses a heightened risk of vexatious litigation, and is "open to correction through ordinary mechanisms of review." Forrester, 484 U.S. at 227, 108 S.Ct. at 544; see also Auriemma v. Montgomery, 860 F.2d 273, 275-76 (7th Cir.1988), cert. denied, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989); Trotter, 748 F.2d at 1182. Moreover, Muller's decision to issue the warrant has nothing in common with the prosecutor's alleged fabrication of evidence during the investigative phase of the state's case in Buckley, conduct which the Supreme Court held not to be entitled to absolute immunity. --- U.S. at ----, 113 S.Ct. at 2616. Muller did not participate in gathering the evidence which formed the basis of the arrest warrant, but made a discretionary decision on the basis of Childers' report and the information she obtained from Midwest Family Resources that there was probable cause to believe that Walrath had violated his parole. Cf. id. --- U.S. at ----, 113 S.Ct. at 2615 (prosecutor is protected by absolute immunity when he evaluates evidence assembled by police, and undertakes to prepare his case for trial). Muller's act of signing the arrest warrant is therefore absolutely immune from suit.
 
 
 17
 Next, Walrath maintains that Getty, Stover, and Magnuson conspired to imprison Walrath on charges they knew to be false, and that they invented new charges to conceal their violation of Walrath's constitutional rights. Walrath further maintains that the defendants manipulated the scheduling of his parole revocation hearing in retaliation for his assertion of his rights, and that Getty violated USPC procedures by overriding the hearing panel's recommendation that Walrath be released from custody.[4] Each of these allegations disputes the propriety of the decision reached, not its quasi-judicial character. Reading Walrath's complaint in the light most favorable to him, it is clear that in early 1993, after Walrath's revocation hearing and again after his special reconsideration hearing, Getty conferred with Stover and Magnuson to determine the proper legal charges to be brought against Walrath on the basis of his belligerent conduct toward his probation officer. In consulting with Stover and Magnuson concerning Walrath's case, Getty performed acts that are closely analogous to the "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings ... which occur in the course of his role as an advocate for the State," and which "must include the professional evaluation of the evidence" gathered by others. Buckley, --- U.S. at ----, 113 S.Ct. at 2615. Getty, Stover, and Magnuson are therefore entitled to absolute immunity from suit for their respective roles in determining the nature of the charges to be brought against Walrath.
 
 
 18
 In challenging Getty's decision to override the recommendation of the second hearing panel and revoke his parole, Walrath asserts that Getty's decision was procedurally irregular. Walrath's challenge does not, however, cast doubt on the quasi-judicial nature of that decision, which involved an exercise of discretion in determining whether parole revocation was appropriate in this particular instance. See Forrester, 484 U.S. at 226-28, 108 S.Ct. at 543-45; Stump v. Sparkman, 435 U.S. 349, 362-63, 98 S.Ct. 1099, 1107-08, 55 L.Ed.2d 331 (1978). Moreover, as Regional Commissioner of the USPC, Getty is empowered to make final decisions concerning parole revocation, and thus acted within the scope of her authority in revoking Walrath's parole. See Forrester, 484 U.S. at 227, 108 S.Ct. at 544 (judge who invokes a power possessed by the court performs a judicial act irrespective of allegations of malice or corruption) (citation omitted); Stump, 435 U.S. at 356-57, 98 S.Ct. at 1104-05 (judge is subject to liability "only when he has acted in the clear absence of all jurisdiction") (citation, internal quotations omitted). Getty is therefore absolutely immune from suit for this decision.
 
 
 19
 Finally, the defendants' scheduling of parole revocation proceedings is an integral part of the revocation decision itself, and functionally comparable to the decisions of a judge concerning the scheduling of a trial. Thompson, 882 F.2d at 1184-85; Trotter, 748 F.2d at 1181-83. Indeed, allowing Walrath to hold the defendants personally liable for their scheduling decision would be analogous to permitting a defendant to obtain monetary damages from a judge for the violation of his speedy trial rights. Thompson, 882 F.2d at 1185. The defendants are thus absolutely immune from civil liability for the alleged delay in the scheduling of Walrath's parole revocation hearing.
 
 
 20
 Walrath's contention that "[a]ll of the defendants' actions were taken behind the closed doors of the Commission, rather than in the light of a controlled and adversarial judicial setting," adds little to his argument. The fact that a judge may act "behind closed doors," and indeed makes some of his most important decisions outside the courtroom, does not deprive these decisions of their judicial character. See Forrester, 484 U.S. at 227, 108 S.Ct. at 544 (informal, ex parte nature of a proceeding does not render it nonjudicial) (citing Stump, 435 U.S. at 363 n. 12, 98 S.Ct. at 1108 n. 12); Dellenbach v. Letsinger, 889 F.2d 755, 761-62 (7th Cir.1989) (same), cert. denied, 494 U.S. 1085, 110 S.Ct. 1821, 108 L.Ed.2d 950 (1990). Similarly, a prosecutor's out-of-court activities in preparing a witness for trial are entitled to absolute immunity because they fall within the scope of the prosecutor's function as an advocate of the state. See Buckley, --- U.S. at ----, 113 S.Ct. at 2615 (citing Imbler, 424 U.S. at 430-31 nn. 32-33, 96 S.Ct. at 994-96 nn. 32-33). In both of these circumstances, the Court recognized that the grant of absolute immunity may entail serious costs, yet concluded that these costs must be borne to protect the integrity and independence of the judicial process.[5] Imbler, 424 U.S. at 427, 96 S.Ct. at 993; Stump, 435 U.S. at 363-64, 98 S.Ct. at 1108-09; see also Thompson, 882 F.2d at 1185.
 
 
 21
 Because the parole revocation decisions of USPC officials must also be protected from contentious litigation, we hold that the members of the United States Parole Commission whom Walrath seeks to hold liable are absolutely immune from suit for the actions they took in revoking his parole. The district court's dismissal of Walrath's suit is therefore AFFIRMED.
 
 
 
 [1]
 For purposes of immunity analysis, Bivens actions are not distinguished from civil rights suits brought against state officers pursuant to 42 U.S.C. Sec. 1983. Harlow v. Fitzgerald, 457 U.S. 800, 818 n. 30, 102 S.Ct. 2727, 2738 n. 30, 73 L.Ed.2d 396 (1982) (quoting Butz, 438 U.S. at 504, 98 S.Ct. at 2909)
 
 
 [2]
 Accord Patterson v. Von Riesen, 999 F.2d 1235, 1238-39 (8th Cir.1993); Bermudez v. Duenas, 936 F.2d 1064, 1066 (9th Cir.1991); Walter v. Torres, 917 F.2d 1379, 1383-84 (5th Cir.1990); Johnson v. Rhode Island Parole Bd. Members, 815 F.2d 5, 8 (1st Cir.1987) (per curiam ); but cf. Russ v. Uppah, 972 F.2d 300, 302-03 (10th Cir.1992) (although members of a parole board have absolute immunity for actions taken in granting or denying parole, absolute immunity does not extend to parole officer who investigated case and recommended at hearing that parole be revoked)
 
 
 [3]
 Although the Supreme Court has never held that parole officials are entitled to absolute immunity when deciding parole questions, see Cleavinger, 474 U.S. at 200-01, 106 S.Ct. at 500-01, the Court has expressed its approval of the reasoning of Sellars, 641 F.2d at 1295, and other appellate court cases in which parole officials have been granted absolute immunity. Cleavinger, 474 U.S. at 200-01, 204, 106 S.Ct. at 500-01, 502
 
 
 [4]
 Walrath alleges that the USPC, acting through Getty and others, retaliated against him for challenging his illegal incarceration by delaying his revocation hearing until December 9, 1992, although it could have been held in October 1992. (R. at 1, Plaintiff's Complaint at 6.) The USPC obviously could not have retaliated against Walrath for filing a petition for habeas corpus in November 1992, by refusing to hold a revocation hearing one month prior to the filing of the petition. It is unclear from Walrath's complaint whether he is alleging some other retaliatory motive besides the filing of the habeas petition for the defendants' delay of his revocation hearing
 
 
 [5]
 For example, in Imbler, where the prosecutor knowingly used false testimony and suppressed favorable evidence at the defendant's trial, the Supreme Court observed that according a prosecutor absolute immunity "does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest." 424 U.S. at 427, 96 S.Ct. at 993