Timothy WILSON, Plaintiff–
Appellee/Cross-
Appellant,

v.

Glenn KELKHOFF, Herbert D. Brown,
Tommy L. Wells, and Delancey H.
Moore,      Defendants–Appellants/Cross-
Appellees.

Nos. 95–1483, 95–2225.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 29, 1995.

Decided June 18, 1996.

Mark E. Wohlberg (argued) and Barbara J. Clinite (argued), Chicago, IL, for plaintiff.

Wendell D. Hayes, Office of the Attorney General, Springfield, IL and Paul Racette (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for defendants.

Before POSNER, Chief Judge, and COFFEY and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Timothy Wilson filed a complaint under 42 U.S.C. § 1983 against an employee of the Illinois Department of Corrections and three members of the Illinois Prisoner Review Board, alleging that they violated his fourteenth amendment right to due process when they revoked his mandatory supervised release. The case was tried to a jury, and Wilson prevailed, securing compensatory and punitive damages. The defendants appeal the denial of their motion for judgment as a matter of law, arguing that they are entitled to either absolute or qualified immunity. Wilson cross-appeals, challenging the magistrate judge's decision to grant him less in attorney's fees than he requested. We vacate both the judgment in Wilson's favor and the award of attorney's fees.

I

■ On June 28, 1989, Wilson was convicted of forgery and sentenced to two years in an Illinois state penitentiary.[1] Wilson's scheduled mandatory supervised release ("MSR") date was January 21, 1990. While Wilson was serving his sentence, Missouri lodged a detainer against him. He initiated proceedings under the Agreement on Detainers, 730 ILCS 5/3–8–9, to travel to Missouri and resolve the pending criminal charge.

On November 13, 1989, Wilson was transported to St. Louis for trial. He was convicted and, on January 17, 1990, sentenced to a term to run concurrent with his Illinois sentence and expire on the same date (four days later). On January 18, while Wilson was still in custody in Missouri, the Missouri authorities presented him with an Illinois MSR agreement that had been prepared by Illinois officials and forwarded to Missouri for Wilson's signature. The agreement provided that Wilson "shall not leave the state or county without prior written permission of [his] agent."

Wilson refused to sign the agreement after discussing the matter with his attorney. Wilson believed that if he signed the agreement while in Missouri he would be in immediate violation of his supervised release because the agreement provided that it was a violation for him to leave Illinois without permission. Wilson told the Missouri officials that he would sign the agreement once he was returned to Illinois. They offered him the agreement three more times during his stay in Missouri, but he still refused to sign it.

Wilson was not released on January 21. Instead, he was returned to Illinois custody at Menard Psychiatric Center. On January 23, Wilson met with Glenn Kelkhoff, the Field Services Supervisor at Menard. Kelkhoff had been in contact with a St. Louis police officer who informed him that Missouri officials had been unsuccessful in getting Wilson to sign the agreement. Based on the fact that Wilson refused to sign the MSR agreement in Missouri, Kelkhoff had already prepared a violation report and notice of charges recommending that Wilson's supervised release be revoked on the ground that he had failed to sign the MSR agreement. During the meeting with Kelkhoff, Wilson requested that Kelkhoff allow him to sign the agreement in Illinois. Kelkhoff refused and presented Wilson with the notice of charges and violation report. Wilson then waived his right to a preliminary hearing.

---

1. The parties dispute many of the factual matters underlying this case. Because the case comes to us on appeal from the court's denial of defendants' motion for judgment as a matter of law, we must consider the evidence in the light most favorable to Wilson. *Hammond Group, Ltd. v. Spalding & Evenflo Cos.,* 69 F.3d 845, 848 (7th Cir.1995).

Wilson's final revocation hearing was held on February 14, 1990. Herbert Brown, a member of the Illinois Prisoner Review Board, was the only person other than Wilson present.[2] Wilson did not receive any prior notice of the revocation hearing. Brown identified himself as being "with the Prisoner Review Board" but did not specifically tell Wilson that he was conducting the final revocation hearing. Wilson was confused about Brown's actual status; Wilson thought he was a parole counselor or investigator. Brown did tell Wilson that Brown would "be consulting with two other members of the Prison [sic] Review Board" and that "[w]e will make a decision on what is to be done in this particular case." However, Brown also said, in response to Wilson's question of when he would be released: "Well, that's entirely up to the Board. I have no control over your release." Wilson was not provided an opportunity to prepare and present witnesses, although he was afforded the opportunity to explain his failure to sign the agreement in Missouri. He gave several reasons, but he did not give the reason he asserts in this litigation: that he was concerned he would be in immediate violation of his supervised release if he signed the agreement while in Missouri.

Following the hearing, Brown consulted with Delancey Moore and Tommy Wells, two other members of the prisoner review board, and they decided to revoke Wilson's supervised release. Shortly thereafter, Wilson received a copy of the board's decision, dated February 13, 1990, which stated that the board had relied upon Kelkhoff's report in reaching its decision to revoke his supervised release because he had violated "Rule No. 1." The board's decision required Wilson to remain in prison until the expiration of his full sentence on July 20, 1990.

On April 28, 1992, Wilson brought suit against Kelkhoff, Brown, Moore, and Wells[3] under 42 U.S.C. § 1983, alleging that Kelk-

hoff's decision to provide him the agreement in Missouri and Kelkhoff's decision to recommend revocation for Wilson's failure to sign in Missouri, as well as the procedures surrounding both the final revocation hearing conducted by Brown and the board's decision to revoke his supervised release, violated his right to due process. The parties consented to a trial before a magistrate judge.

Defendants filed a motion to dismiss under FED. R. CIV. P. 12(b)(6), arguing that Wilson's complaint failed to state a claim because, among other things, Brown, Moore, and Wells were entitled to absolute or qualified immunity and Kelkhoff was entitled to qualified immunity. The magistrate judge denied the motion to dismiss without discussing the immunity arguments. Defendants then filed a motion for summary judgment, raising the same immunity arguments. The magistrate judge never ruled on the summary judgment motion. The magistrate judge granted Wilson leave to amend his complaint to provide that in addition to violating his right to due process, the defendants' conduct also violated his eighth amendment right to be free from cruel and unusual punishment and his fourteenth amendment right to equal protection.

■ The magistrate judge held a jury trial on July 18–21, 1994. The defendants made a motion for judgment as a matter of law under FED. R. CIV. P. 50, again raising the immunity arguments. The magistrate judge reserved his ruling until after the jury's verdict. The jury returned a verdict for Wilson in the amount of $14,400 in compensatory damages and $20,000 in punitive damages. Following judgment, the defendants renewed their motion for judgment as a matter of law and, in the alternative, moved for a new trial under FED. R. CIV. P. 59(a). On January 27, 1995, the magistrate judge issued an order denying defendants' motions on the ground that the jury's verdict was supported by sufficient evidence that Wilson's due process rights were violated. The magistrate's order

2. Under Illinois law, a minimum of three board members must participate in the decision to revoke supervised release. However, only one board member need actually be present at the revocation hearing. 730 ILCS 5/3–3–9(e).

3. Various other defendants who were also named in the complaint have since been dismissed. Wilson does not challenge those dismissals, and we do not address the identity of those defendants or their alleged wrongful acts because neither bears upon the issues presented in this appeal.

did not address the defendants' immunity arguments.[4] On February 22, the defendants filed a notice of appeal from the judgment and the denials of their motion for judgment as a matter of law and motion for a new trial.

Wilson filed a petition for attorney's fees, to which the defendants did not object. On April 19, 1995, the magistrate judge issued an order granting the petition, but for less than the amount requested. Wilson filed a notice of appeal from that decision on May 19.

## II

Defendants argue that as a result of the pretrial order and jury instructions, the multiple claims raised in Wilson's complaint were reduced to one, that is, that the board member defendants violated Wilson's right to due process by the manner in which they conducted his final revocation hearing. Wilson does not directly respond to the defendants' argument that he waived his other claims. Instead, he states that the evidence at trial demonstrates multiple due process violations. Relative to Kelkhoff, Wilson argues that he raised two claims: (1) Kelkhoff violated his right to due process by not providing him an opportunity to sign the agreement in Illinois, and (2) Kelkhoff violated his right to due process by initiating revocation proceedings against him for failing to sign the agreement in Missouri. With respect to the prisoner review board members, Wilson argues he raised two other claims: (1) the procedures the board followed in revoking his supervised

release failed to give him the process he was due, and (2) the board's decision to revoke his parole for failing to sign the agreement in Missouri violated due process.[5]

Defendants argue that Wilson's complaint was superseded by the pretrial order, which they claim focused solely upon the proposition that Wilson did not receive the requisite procedural protections in the revocation proceeding. Defendants are correct to the extent that when the district court enters a pretrial order, "the pre-trial order is treated as superseding the pleadings and establishes the issues to be considered at trial." *Erff v. MarkHon Indus., Inc.,* 781 F.2d 613, 617 (7th Cir.1986); *see also* FED. R. CIV. P. 16(e). However, the brief pretrial order in this case did not clearly frame the due process claims at issue.[6] Instead, it is written in vague generalities. The order does include sufficient references to each of the four due process claims raised in the amended complaint that we cannot find the parties and the court intended to exclude any of them.

The defendants also argue that regardless of the evidence Wilson raised at trial, he waived several of his claims by failing to request jury instructions that encompassed those claims. A party waives an argument on appeal if that argument related to a jury instruction and he failed to object to the relevant jury instruction below. *Bogan v. Stroud,* 958 F.2d 180, 182–83 (7th Cir. 1992); *see also* FED. R. CIV. P. 51. Addition-

---

4. We are concerned by the magistrate judge's failure to address the merits of the defendants' immunity defenses prior to trial. "One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). "The entitlement [to qualified immunity] is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 233, 111 S.Ct. at 1794 (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985)). Consequently, a district court must reach the merits of immunity defenses prior to allowing a case to go to trial.

5. We note that Wilson sufficiently articulated the above four claims in his amended complaint. We also note that there is no dispute that Wilson abandoned the eighth amendment and fourteenth amendment equal protection claims, leaving only the fourteenth amendment due process claims.

6. The purpose of a pretrial conference, and the resulting order, is to aid the parties and the court in the preparation for and conduct of the trial. *Erff,* 781 F.2d at 617. An essential task in fulfilling that purpose is to clearly set forth the various issues the parties intend to litigate. This case, which presents intermingled and poorly articulated constitutional claims, would have benefitted greatly from a correct application of FED. R. CIV. P. 16.

ally, even though a party's complaint contains certain claims, he will waive those claims if he fails to object to their exclusion from the jury instructions. *Maynard v. City of San Jose,* 37 F.3d 1396, 1404 (9th Cir. 1994). That is what happened here.

Two jury instructions related to the alleged violations of Wilson's due process rights. The first of these instructions, court's number 2, provided that the decision to grant, deny, or revoke mandatory supervised release must be accompanied by due process. It also spelled out the due process protections required in a parole revocation hearing. The second relevant instruction, defendants' number 13, articulated the alleged constitutional violations forming the basis of Wilson's § 1983 case:

> The plaintiff claims that he was injured and sustained damage, and that the defendants violated plaintiff's due process rights in one or more of the following respects:

> Defendants Brown, Wells, and Moore in revoking plaintiff's mandatory supervised release, without affording plaintiff due process as defined elsewhere in these instructions.

> Defendant Kelkhoff, in approving the charges for revocation of mandatory supervised release, although he knew the plaintiff was not guilty of the violation with which he was charged.

> Defendants deny that they did any of the things claimed by plaintiff and deny that they violated plaintiff's due process rights.

Two of Wilson's due process claims are conspicuously absent from court's number 2 and defendants' number 13: (1) that Kelkhoff violated Wilson's due process rights by not providing him an opportunity to sign the agreement in Illinois, and (2) that the prisoner review board members violated Wilson's due process rights by revoking his MSR for failing to sign the agreement in Missouri. Because Wilson did not object to the exclusion of these claims from the jury instructions, he has waived them, and we will not consider them in this appeal.

■ We now turn to the central issue in this case—whether the magistrate judge erred in not granting the defendants' motion for judgment as a matter of law on the grounds of absolute or qualified immunity. We review a lower court's grant or denial of a motion for judgment as a matter of law *de novo,* considering the evidence in the light most favorable to the nonmoving party. *Hammond Group, Ltd. v. Spalding & Evenflo Cos.,* 69 F.3d 845, 848 (7th Cir.1995).

■ In determining whether a government official is entitled to absolute immunity, we apply a functional approach. *Buckley v. Fitzsimmons,* 509 U.S. 259, 269, 113 S.Ct. 2606, 2613, 125 L.Ed.2d 209 (1993). That is, we look to "the nature of the function performed, not the identity of the actor who performed it." *Id.* (quoting *Forrester v. White,* 484 U.S. 219, 229, 108 S.Ct. 538, 545, 98 L.Ed.2d 555 (1988)). Absolute immunity is only accorded for limited functions; "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed,* 500 U.S. 478, 486–87, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991). Thus, the official seeking the benefit of immunity bears the burden of proving that it is justified. *Forrester,* 484 U.S. at 224, 108 S.Ct. at 542.

■ The courts have recognized that certain functions deserve absolute immunity. Among the functions so protected are "truly judicial acts" performed by a judge within his lawful jurisdiction. *Forrester,* 484 U.S. at 226–27, 108 S.Ct. at 543–44. Prosecutors are also accorded absolute immunity for their conduct that is "closely associated with the judicial process." *Cleavinger v. Saxner,* 474 U.S. 193, 200, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985). Absolute immunity is not limited to government officials with the title of prosecutor or judge; officials performing "functionally comparable" acts in other contexts, such as administrative agencies, are also accorded absolute immunity. *Butz v. Economou,* 438 U.S. 478, 512, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978).

■ We do not write on a clean slate with respect to what immunity is available to prisoner review board members and parole officials. We have accorded prisoner review

board members absolute immunity for their activities that are analogous to those performed by judges.[7] Consistent with the other circuits, we have held that "parole board members are absolutely immune from suit for their decision to grant, deny, or revoke parole." *Walrath v. United States*, 35 F.3d 277, 281 (7th Cir.1994) (collecting cases). Additionally, we have held that activities that are "inexorably connected with the execution of parole revocation procedures and are analogous to judicial action" invoke absolute immunity. *Id.* at 282 (quoting *Trotter v. Klincar*, 748 F.2d 1177, 1182 (7th Cir.1984)). Thus, "not only the actual decision to revoke parole, but also activities that are part and parcel of the decision process" justify absolute immunity. *Thompson v. Duke*, 882 F.2d 1180, 1184 (7th Cir.1989) (quoting *Trotter*, 748 F.2d at 1182), *cert. denied*, 495 U.S. 929, 110 S.Ct. 2167, 109 L.Ed.2d 496 (1990). We have also held that prison officials who are not prisoner review board members are entitled to absolute immunity under circumstances where they perform acts with prosecutorial or judicial analogs. *Walrath*, 35 F.3d at 282 (holding parole official entitled to absolute immunity for signing an arrest warrant).

■■■ Wilson alleges that numerous acts by the three prisoner review board members violated his right to due process: (1) the failure to provide him adequate notice of the hearing; (2) the failure to provide him an opportunity to present evidence and witnesses; (3) the failure to adequately explain that the February 14 hearing was the final revocation hearing; and (4) the failure to provide him adequate written notice of the reasons for the revocation. Wilson argues that the board members should not be accorded absolute immunity for any of these acts because the acts were "not discretionary, but involved simple compliance with the law."

Wilson relies upon *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993), for the proposition that prisoner review board members are not

covered by absolute immunity in the performance of nondiscretionary acts. In *Antoine*, the Supreme Court held that a court reporter is not entitled to absolute immunity for the failure to promptly provide a transcript of a criminal trial. *Id.* at 436–37, 113 S.Ct. at 2172. The Court reasoned that although a court reporter's job of transcribing the proceedings is "part of the judicial function," a court reporter, unlike a judge performing an adjudicative act, does not exercise discretion in the performance of that function. *Id.* at 436–37, 113 S.Ct. at 2171–72.

According to Wilson, the prisoner review board members in this case should be denied absolute immunity because they did not exercise their discretion in failing to provide Wilson with the process he was due; the law was clear—the board members simply failed to follow it. Wilson misapprehends the nature of the Court's decision in Antoine. Consistent with the Court's prior opinion in *Forrester*, 484 U.S. at 229, 108 S.Ct. at 545, *Antoine* stands for the proposition that ministerial acts unrelated to the function immunity is intended to protect are not covered by absolute immunity. *Antoine* and *Forrester* do not support the proposition that judicial acts that are part of the judicial function are excluded from absolute immunity because they could be characterized as nondiscretionary or even ministerial. Indeed, we rejected a similar attempt to parse an official's conduct in *Thompson v. Duke*, where a § 1983 plaintiff argued that absolute immunity should not protect prisoner review board members for failing to hold a timely revocation hearing. The plaintiff's argument, identical in substance to Wilson's, was that because the board members had no discretion to deny or postpone the revocation hearing the scheduling of the hearing was an "administrative" act outside the scope of absolute immunity. *Thompson*, 882 F.2d at 1183. We rejected the plaintiff's attempt to avoid the bar of absolute immunity by trying to characterize certain aspects of the judicial function as administrative and therefore not worthy of protection. We held that conduct

---

7. The Illinois Prisoner Review Board is functionally identical to the traditional, freestanding "pa-

role board."

deserving of protection includes not only actual decisions, but also those mundane, even mechanical, tasks undertaken by judges that are related to the judicial process: "[T]he fact that the activity is routine or requires no adjudicatory skill renders that activity no less a judicial function." *Id.* at 1184.

The actions of the prisoner board members in this case fall squarely within the class of conduct for which absolute immunity is provided. The decision to revoke Wilson's supervised release, albeit on grounds that Wilson argues were not valid, is a prototypical quasi-judicial act deserving of absolute immunity. *See Walrath,* 35 F.3d at 283. Absolute immunity protects board members not only for the decision to revoke Wilson's supervised release, but the board members' actions that are "part and parcel" of the decision-making process. *See Trotter,* 748 F.2d at 1182. Thus, like the scheduling failure in *Thompson,* the board members are absolutely protected from suit for not providing Wilson sufficient notice of the final revocation hearing.[8] And with respect to the conduct of the hearing itself, the board members merit absolute immunity for their failure to provide Wilson an opportunity to present evidence and witnesses. Similarly, the board members are protected from Brown's alleged failure to adequately identify the final revocation hearing to Wilson. Wilson attempts to characterize the hearing as "investigative" because Brown did not clearly inform him regarding the adjudicative nature of the hearing. However, Wilson's confusion and resulting misperception regarding the proceeding does not change the adjudicative nature of the revocation hearing. The alleged deficiency in the board's written decision is also not amenable to an action for damages, given that it is the product of the quasi-judicial process.

As the foregoing discussion details, all of Wilson's claims against the three prisoner review members strike at the heart of the adjudicative function those board members perform; his claims against the board members are therefore precluded by absolute immunity. Thus, the magistrate judge erred in

not granting the defendants' motion for judgment as a matter of law with regard to those defendants.

■ The defendants also argue that Kelkhoff is entitled to absolute immunity with respect to Wilson's claim that Kelkhoff violated his right to due process by charging him with a violation of his supervised release on the ground that he failed to sign the MSR agreement in Missouri. From the record below, it appears that the defendants failed to raise absolute immunity as a defense relative to Kelkhoff. Ordinarily, the failure to raise an issue below forecloses review of that issue on appeal. However, because Wilson addressed the merits of the issue and failed to argue that the defendants waived it, Wilson has waived the defendants' waiver, *see United States v. Archambault,* 62 F.3d 995, 998 (7th Cir.1995), and we will reach the issue.

■ Again, in determining whether absolute immunity applies, we look to the conduct at issue. The allegedly wrongful conduct is Kelkhoff's decision to initiate the revocation proceeding by preparing what Wilson argues was a baseless violation report and notice of charges. According to the defendants, Kelkhoff should be accorded absolute immunity because his conduct "is analogous to a prosecutor bringing criminal charges." The defendants also point to the fact that in *Walrath* we accorded a Department of Corrections employee absolute immunity for signing an arrest warrant, 35 F.3d at 282, which the defendants argue is functionally comparable to Kelkhoff's decision to initiate charges. Wilson argues that Kelkhoff's conduct in investigating the circumstances of the alleged violation and then initiating charges was similar to the investigative conduct for which the prosecutors were denied absolute immunity in *Buckley,* 509 U.S. at 275–76, 113 S.Ct. at 2617.

We do not believe that Kelkhoff's conduct is functionally comparable to the types of conduct accorded absolute immunity. In initiating the revocation proceedings by filing the violation report and notice of charges,

---

**8.** Indeed, the uncontested evidence at trial established that the responsibility to notify inmates of

a revocation hearing is borne by the Department of Corrections, not the prisoner review board.

Kelkhoff acted identically to a parole officer seeking to revoke a parolee's parole. Although we have not addressed the question of whether absolute immunity protects parole officers in their decision to seek revocation of parole, several of our sister circuits have come to the conclusion that only qualified immunity is available for that conduct. *See Russ v. Uppah,* 972 F.2d 300, 303 (10th Cir. 1992); *Mee v. Ortega,* 967 F.2d 423, 426–29 (10th Cir.1992); *Ray v. Pickett,* 734 F.2d 370, 373–75 (8th Cir.1984); *Galvan v. Garmon,* 710 F.2d 214, 215 (5th Cir.1983), *cert. denied,* 466 U.S. 949, 104 S.Ct. 2150, 80 L.Ed.2d 536 (1984).

The courts that have addressed this issue analogize a parole officer's decision to file a notice of charges (and thereby initiate a revocation proceeding) to a police officer filing an affidavit seeking an arrest warrant, rather than to a prosecutor initiating criminal charges. *See, e.g., Mee,* 967 F.2d at 427. We are persuaded by that analogy, and the nonprosecutorial characterization of this type of conduct is, as noted by the court in *Mee,* supported by the Supreme Court's opinion in a different context: "[A parole] officer is not by this recommendation converted into a prosecutor committed to convict." *Id.* at 426 (quoting *Gagnon v. Scarpelli,* 411 U.S. 778, 785, 93 S.Ct. 1756, 1761, 36 L.Ed.2d 656 (1973)). By initiating the revocation process, Kelkhoff's conduct was functionally different from the department employee accorded absolute immunity in *Walrath.* Indeed, the difference in their roles highlights the appropriateness of the police officer analogy. The employee in *Walrath* was performing an adjudicative function by making an independent probable cause determination in deciding to issue an arrest warrant based upon evidence gathered by others. 35 F.3d at 282. Kelkhoff, by investigating the charge and then filing the notice of charges and violation report, performed a function analogous to an employee who seeks an arrest warrant. Such conduct does not have a prosecutorial or judicial analog and, consequently, does not fall within the ambit of absolute immunity.

■■■■ Defendants argue in the alternative that Kelkhoff is entitled to qualified immunity for his decision to initiate revocation proceedings against Wilson. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The question of whether a particular constitutional right is clearly established is reviewed *de novo. Maltby v. Winston,* 36 F.3d 548, 555 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2576, 132 L.Ed.2d 827 (1995). Prior to reaching the issue of qualified immunity, we must first determine whether Wilson proved a viable constitutional violation.

■■■ "[T]he presence of a parole system by itself does not give rise to a constitutionally protected interest in parole release." *Board of Pardons v. Allen,* 482 U.S. 369, 373, 107 S.Ct. 2415, 2418, 96 L.Ed.2d 303 (1987). However, where a parole statute creates "an expectation of parole," an inmate has a protectable liberty interest in release. *Id.* at 376–78, 107 S.Ct. at 2420.[9] With the exception of inmates receiving certain sentences, the relevant Illinois statute provides for a protectable liberty interest in release; indeed, the statute requires that the board provide most inmates with a fixed release date. 730 ILCS 5/3–3–2.1.

■■■ Wilson argues that Kelkhoff's decision to initiate revocation proceedings against him for failing to sign the MSR agreement in Missouri was totally arbitrary

---

9. Neither party discusses the potential impact of the Supreme Court's decision in *Sandin v. Conner,* where the Court held that the inquiry of whether a protectable liberty interest exists should focus upon the nature of the alleged deprivation and not the language of the relevant regulation. —— U.S. ——, ——, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995). It appears that the Court intended to leave undisturbed the cases holding that a protectable liberty interest exists in parole statutes that create an "expectancy of release." We infer that conclusion from the fact that the Court approvingly cited *Allen* for the proposition that "States may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Id.* at ——, 115 S.Ct. at 2300.

and therefore violated his right to due process. In support of that conclusion, Wilson first argues that a requirement of signing the MSR agreement is not listed among the enumerated conditions for supervised release set forth at ILL. ADMIN. CODE tit. 20, § 1610.120, or in the then-relevant statutory sections, ILL. REV. STAT. ch. 38, para. 1003–3–7, para. 1003–3–9 (currently 730 ILCS 5/3–3–7 and –9). However, para. 1003–3–7(a) clearly provided the board with the discretion to set conditions on supervised release, and we cannot think of a more reasonable condition of supervised release than requiring the inmate to sign an agreement to abide by the other conditions of supervised release.

Wilson is not dissuaded by the language of the statute. He goes on to argue that even if signing the agreement is a condition to supervised release, seeking to revoke his supervised release for failing to sign the agreement under the circumstances in this case is totally arbitrary. He argues that if he had signed the MSR agreement in Missouri, he would have been in immediate violation of the conditions of his supervised release, one of which was that he could not leave Illinois without the written permission of his parole officer. It is difficult to think of a more ludicrous reason for declining to sign an MSR agreement, for the board would be ridiculed if it revoked his supervised release because he did something they told him to do (not to mention the fact that you cannot "leave" Illinois if you are currently in Missouri). Additionally, Illinois law specifically provided that the board could release an inmate to a detainer, ILL. REV. STAT. ch. 38, para. 1003–3–6 (currently 730 ILCS 5/3–3–6), which is exactly what happened here for Wilson was on detainer in Missouri. Thus, Wilson's argument that it was arbitrary to seek to revoke his supervised release for failing to sign the MSR agreement while in Missouri is unavailing.

Wilson should have signed the MSR agreement in Missouri. His failure to do so is what caused the revocation of his supervised release, not any unconstitutional conduct by Kelkhoff. *See Crenshaw v. Parratt,* 698 F.2d 360, 361 (8th Cir.1983) (holding that there was no constitutional deprivation where inmate failed to sign parole agreement). Thus, the magistrate judge erred in not granting the motion for judgment as a matter of law with regard to Kelkhoff.

Our resolution of this case, vacating the judgment for Wilson and directing the entry of judgment in favor of the defendants requires that we vacate the attorney's fees ordered below. *See Mother Goose Nursery Sch., Inc. v. Sendak,* 770 F.2d 668, 675 (7th Cir.1985), cert. denied, 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986). Thus, we do not reach Wilson's arguments regarding the magistrate judge's errors relative to his request for fees.

VACATED and REMANDED for entry of judgment in favor of the defendants.