Edith M. VIERO, Special Administrator
of the Estate of John Rosario, Jr.,
deceased, Plaintiff,

v.

Diane BUFANO, Marcia Little, Victor
Brooks, William Carter and Duane
Porter, Defendants.

No. 95 C 2281.

United States District Court,
N.D. Illinois,
Eastern Division.

May 15, 1996.

Leo T. McGonigal, Chicago, IL, for Plaintiff.

Sandra Castillo, Assistant Attorney General, State of Ill., for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

On March 2, 1993 14 year old John Rosario, Jr. ("Rosario") committed suicide while in the custody of the Illinois Department of Corrections ("Department") at its St. Charles Youth Correctional Facility ("St. Charles"). Edith Viero ("Viero"), Rosario's mother and the Special Administrator of his Estate, has filed this action under 42 U.S.C. § 1983 ("Section 1983"),[1] contending that Rosario's suicide stemmed from a violation of his constitutional rights by Illinois juvenile court probation officer Diane Bufano ("Bufano") and by four of Department's employees— Marcia Little ("Little"), Victor Brooks ("Brooks"), William Carter ("Carter") and Duane Porter ("Porter"). Essentially Viero asserts that each of the five defendants was deliberately indifferent to Rosario's certain medical needs including a need to be protected from his own suicidal tendencies.

. Bufano, Little and Brooks[2] have moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. Both sides have substantially complied with this District Court's General Rule ("GR") 12(M) and 12(N),[3] and the motion is fully briefed and ripe for decision. For the reasons stated in this memorandum opinion and order, defendants' motion is denied (except to a limited extent as to Brooks).

### Summary Judgment Principles

Under familiar Rule 56 principles defendants have the burden of establishing both the lack of a genuine issue of material fact and that they are entitled to a judgment as a matter of law (*Celotex v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). Summary judgment is appropriate only if the record reveals that no reasonable jury could conclude that defendants violated Rosario's constitutional rights.

---

1. Viero also advances two claims under state law (see this Court's earlier opinion (the "Opinion"), 901 F.Supp. 1387, 1391 (N.D.Ill.1995)). Further citations to the Opinion will take the form "Opinion at ——," specifying the F.Supp. page number but omitting the volume number. Opinion at 1396 rejected defendants' motion to dismiss the state law claims, and the current summary judgment motion has not targeted those claims.

2. Porter and Carter were in charge of supervising the area where Rosario committed suicide. Porter was not served until last month (on April 12, 1996) and has not yet filed an answer. Carter has not yet been served.

3. To facilitate the identification of any factual disputes, or to demonstrate the absence of any factual disputes, this District Court has adopted GR 12(M) and 12(N), which require the parties to set out their respective factual positions together with references to the record. This opinion will use "V." for Viero and "D." for defendants in referring to their respective statements under GR 12(M) (cited "D. 12(M) ¶—") and 12(N) (cited "V. 12(N) ¶—") and to their exhibits and memoranda. Wherever Viero has explicitly or implicitly admitted a portion of defendants' GR 12(M) statement, only "D. 12(M) ¶—" will be cited. For the most part this opinion will cite only to the GR 12(M) and 12(N) statements, not to the underlying record citations.

This Court is called upon to draw inferences in the light most favorable to nonmovant Viero, but it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). What follows in the *Facts* section is thus a factual statement drawn from the parties' submissions, with any differences between them resolved in Viero's favor. For that reason this opinion will refer to matters in Viero's version as established facts and not merely as contentions.

### Facts

On November 6, 1992 Rosario had a confrontation with Viero at their home, during which he broke a window and threatened to strike her (Brooks Dep.Ex. 3 at 22–23). That incident, along with previous behavioral problems,[4] led Viero to have Rosario admitted to Hartgrove Hospital ("Hartgrove") on December 17, 1992 (D. 12(M) ¶ 7). On a form filled out at the time of admission, psychiatrist Dr. Ralph Newman preliminarily concluded that Rosario had a mental illness or emotional disturbance requiring hospitalization, as evidenced by (V.Ex. 3):

> violent behavior including fighting, stealing and gang involvement. Pt. has been running away from home and not attending school placing himself in danger.

Dr. Newman's provisional diagnosis was "major depression with conduct disorder" (V.Ex. 2 at 1).

During his stay at Hartgrove Rosario was diagnosed with Attention Deficit Hyperactivity Disorder and, in addition to required participation in individual and group therapy, he was prescribed 10 milligrams of Ritalin administered three times per day (D.Ex. 4 at 2). Rosario responded positively to that course of treatment (*id.*):

> He responded with a decrease in impulsive and hyperactive behavior. His school performance improved and he was getting into fewer conflicts with peers.

Rosario remained in the hospital until he was discharged on January 19, 1993. On the preceding day Dr. Newman had prepared a handwritten "discharge summary," recording the same diagnosis of Attention Deficit Hyperactivity Disorder (*id.*). Dr. Newman also recommended in the discharge summary that Rosario should continue taking 10 milligrams of Ritalin three times per day (*id.*). That version of the discharge summary was distributed both to Bufano and to St. Charles.

Dr. Newman also prepared a more detailed, typed discharge summary dated January 19, 1993 (V.Ex. 2). Nothing in the record reflects that the second version of the discharge summary was either sent to or requested by Bufano or by anyone at St. Charles. Nonetheless, because it chronicles in more detail Rosario's life history and hospitalization and thus informs this Court's analysis, several points deserve mention:

1. In the "Provisional Diagnoses" section (*id.* at 1), the typed summary notes that when Rosario was admitted to Hartgrove Dr. Newman's principal provisional diagnosis was "Major Depression with Conduct Disorder," and the secondary provisional diagnosis was a notation as to the need to "Rule out ADHD" (referring to Attention Deficit Hyperactivity Disorder).

2. In the "History of Present Illness" section (*id.* at 2) the summary states:

> He is running away from home and is alleged to have expressed suicidal ideation in the past, planning to stab himself with a knife.

3. This statement is set out in the "Mental Status Upon Admission" section (*id.*):

> Mood was depressed, tearful, and labile.

4. In part the "Treatment Data: Treatment Plan, Response and Clinical Course" section says (*id.* at 3):

> During this hospitalization DCFS was contacted with the possibility of mother signing over parental rights be-

---

4. Although he was only 14 at the time of his death, Rosario had a lengthy record of encounters with the law. According to Bufano's January 13, 1993 supplemental social investigation report, before the November 1992 incident Rosario had been the subject of four referrals to the juvenile court, with two findings of delinquency and one period of supervision.

cause she had been largely absent during efforts to get her to come in to give a social history. At this point plans were for the patient to be discharged on 1/19 and taken directly to court where an order was to be obtained by DCFS to have patient become a ward of the court. The patient in response to this was quite tearful and very despondent. He learned that he was likely to be sentenced and that his mother was pressing charges against him. He felt angry, betrayed and abandoned by his mother.

5. In the "Discharge Diagnoses" section (*id.* at 1) Dr. Newman's principal diagnosis was "Attention Deficit Hyperactivity Disorder," with a secondary diagnosis of "Conduct Disorder." Dr. Newman also recorded Rosario's ratings as "severe" under "Psychosocial Stressor" and "poor" under "Highest Level of Adaptive Functioning." He then described Rosario's prognosis as "guarded" (*id.* at 5).

Because he had already been adjudged delinquent on November 23, 1992 (D.Ex. 11 at 2), Rosario faced a dispositional hearing immediately upon his discharge from Hartgrove.[5] At the request of Judge Charles May (who would preside over the dispositional hearing), Bufano prepared a January 13, 1993 supplemental social investigation report for the January 19 hearing (D. 12(M) ¶ 15).[6] While preparing the report Bufano spoke with hospital social worker Carolyn Zafiris ("Zafiris"), with an unnamed nurse, with Viero and with Rosario himself (*id.* ¶¶ 11–12, 16). She contends that none of the persons to whom she spoke gave her any indication that Rosario was a suicide risk. But Viero says that when she spoke with Bufano she expressed "her concerns about [Rosario's] emotional health, his depression, his hyperac-

tivity, his thoughts of suicide and his need for medication," and that Bufano acknowledged that she was aware of Rosario's "nerve" problem (V. 12(N) ¶¶ 16, 39).

After preparing her January 13 report, Bufano also had access to two pieces of information from Hartgrove (D. 12(M) ¶ 13): the handwritten discharge summary of January 18, 1993 and a copy of a January 19, 1993 letter from Zafiris to Judge May (D.Ex. 5). Zafiris' letter described the progress that Rosario had made while at Hartgrove, but it also recommended continued individual and family therapy.

Bufano admits that she knew that Rosario was supposed to continue taking Ritalin after his discharge from Hartgrove (Bufano Dep. 45–47). Moreover, Viero swears that she had Rosario's Ritalin prescription filled and tried to give it to Bufano to take with Rosario to St. Charles, but that Bufano refused (Viero Aff. ¶ 10).

At the January 19, 1993 dispositional hearing, Judge May committed Rosario to Department's custody for a term of 90 days (D. 12(M) ¶ 17). That same day Bufano provided Department with a packet of information that included the January 13, 1992 supplemental social investigation and copies of two earlier social investigation reports; a November 30, 1992 summary progress report; the January 18, 1993 handwritten discharge summary from Hartgrove; Zafiris' January 19, 1993 letter; the juvenile court petition; and a copy of the police report from the November 6, 1992 incident (*id.* ¶ 18).

After two days at a temporary detention center Rosario was admitted to St. Charles on January 21, 1993. As part of the routine intake procedure Rosario underwent a suicide screening administered by Little, who was a correctional counselor at St. Charles but not the counselor assigned to Rosario (*id.*

---

**5.** Illinois' Juvenile Court Act, 705 ILCS 405/1–1 to 405/7–1, provides that if a court adjudges a minor to be delinquent it has a range of disposition orders available to it, including the possibility (if certain conditions are met) of committing the minor to Department's Juvenile Division (705 ILCS–405/5–23(1)(b)).

**6.** That was the third such report that Bufano had prepared for Rosario. She had been assigned as

Rosario's probation officer in March 1991 (Bufano Dep. 16) and had ongoing contact with both Rosario and Viero from then until the time of Rosario's death. In fact Viero called Bufano soon after Rosario committed suicide, Bufano attended the wake, and Bufano stayed in contact with some members of Rosario's family even after his death (*id.* 67–70).

¶¶ 21–25). St. Charles' procedures required that the person performing the suicide screening ask a series of questions and reduce the youth's responses to writing on a "Suicide Screening Form" (D.Ex. 7 at 1). According to the procedure, if the youth answers any of the questions affirmatively the intake counselor must so advise the mental health professional on duty, who must in turn interview the youth to determine whether he or she should be placed in the general population or alternatively in a special observation unit (*id.*). If no mental health professional is on duty, the shift supervisor must still communicate with the mental health professional, who must then advise the shift supervisor whether the youth should be placed in the general population or the observation unit (*id.* at 2).

Little administered the suicide screening to Rosario, and according to the Suicide Screening Form Rosario answered "yes" to two questions. First, as to the question "Have you ever been given medication for a mental illness?," Little wrote down Rosario's response as "sm. white pill for nerves—last taken 1–19–93 a.m. @ Hosp. for ADHD" (D.Ex. 8). Little also recorded a "yes" answer to this question:

> Have you ever thought about hurting yourself? If yes, explain: When, do you have a plan, what is it?

Little summarized Rosario's answer as "2 yrs ago—mom's x boyfriend used to beat him."

At the bottom of the suicide screening questionnaire Little checked two boxes to indicate that there should be a referral to a mental health professional and the crisis team leader. She then turned the form over to shift supervisor Robert Gibson ("Gibson") (D. 12(M) ¶ 29).[7] Gibson spoke with mental health professional David Hanchett ("Hanchett") about whether Rosario should be placed in the general population. Gibson memorialized the conclusion they reached on the Suicide Screening Form (this seems to be what D.Ex. 8 says):

> Mr. Hanchett was called and he agreed that youth was not in crisis at this time; youth appeared to be in good humour and no signs of depression.

Again Viero swears to a version different from Little's. According to Viero she had a telephone conversation with Little at the time of Rosario's admission to St. Charles, during which she "discussed [her] worries about [Rosario], his depression, his needs for medication for hyperactivity and talked with [Little] about [Rosario's] previous ideas of committing suicide" (Viero Aff. ¶ 11).

Rosario was placed in the general population at St. Charles and never saw a mental health professional. He did see Dr. Gerry Cerniak for a physical exam as part of the intake procedure, and Dr. Cerniak, upon noting Rosario's Ritalin prescription, recommended that Rosario see a psychiatrist (P.Ex. 4).[8] That never happened.

Soon after Rosario was committed Viero brought Rosario's Ritalin prescription to St. Charles, but the staff refused to take it (Viero Aff. ¶ 14). Then Viero had a telephone conversation with Brooks, the superintendent at St. Charles, approximately one week after Rosario was admitted to St. Charles (*id.* ¶ 14). During that conversation Viero told Brooks that (1) Rosario had been prescribed Ritalin at Hartgrove, (2) she had tried to deliver the Ritalin for Rosario at St. Charles but the staff prevented her from doing so and (3) she was worried about Rosario (*id.* ¶ 15). Brooks replied, "We'll take care of everything, don't worry about it" (*id.*).

In any event Rosario was never given any Ritalin, he was never seen by a mental health professional, and he was not placed in any

---

7. Little did not recall whether she gave the form to Gibson or to the assigned counselor, but it is clear from Gibson's affidavit that he was given the form. And although that portion of Gibson's affidavit will not be considered in ruling on the current motion (see page 16 of this opinion), it is useful here to provide some background information that is not available elsewhere in the parties' submissions.

8. D.R.Mem. 9 contends that Dr. Cerniak's note in Rosario's medical file is "inadmissible hearsay and should be stricken from the record." Defendants do not explain the basis for that sweeping assertion, and it is just as well that they did not make an effort because this Court knows of none. Certainly Dr. Cerniak's handwritten notes would appear to qualify for admissibility under either or both of Fed.R.Evid. 803(6) and 803(8).

sort of special observation unit. On March 2, 1993 Rosario died of self-inflicted asphyxiation by hanging (D. 12(M) ¶ 34).

### Background Matters

Viero initially filed this lawsuit in the Circuit Court of Cook County, but defendants removed it to this District Court on April 13, 1995. Viero claims that defendants infringed Rosario's Eighth Amendment rights [9] by being deliberately indifferent to Rosario's serious medical needs, and she also brings a supplemental state law claim for wrongful death. Viero contends (1) that Bufano failed to take adequate steps to notify Department about Rosario's serious medical needs and suicide risk and (2) that Little and Brooks failed to ensure that Rosario received his medication and mental health counseling.

Bufano, Little and Brooks raise three arguments in support of their Rule 56 motion. First they contend that none of them knew there was a strong likelihood that Rosario would attempt to take his own life, so that they are not liable for any Eighth Amendment violation. They also reassert two contentions that they made—and that the Opinion rejected—in Bufano's and Little's unsuccessful motion to dismiss: that all three of them are entitled to qualified immunity, and that Bufano is entitled to absolute immunity because she serves in a quasi-judicial capacity.

Before this opinion turns to defendants' arguments, a brief side trip is necessary to point out what this Court will and will not consider in deciding this motion. Although both sides have complied with GR 12(M) and 12(N) for the most part, defendants' final filing—an 18 page Reply Memorandum and a 27 page "Response to Plaintiff's Rule 12(N) Statement of Additional Facts" supplement-

ed by 11 exhibits—is problematic in two respects.

First, defendants have not simply responded to Viero's GR 12(N)(3)(b) statement of additional facts—they have also included replies to Viero's GR 12(N)(3)(a) responses to defendants' GR 12(M)(3) statement of facts.[10] Such counter-responses are not permitted by this District Court's rules, and this Court will not consider them.

GR 12(M) specifies the ground rules for summary judgment movants such as defendants, while GR 12(N) sets out what an opponent may do. And the pertinent part of GR 12(M) provides (emphasis added):

> If *additional material facts* are submitted by the opposing party pursuant to section N of this rule, the moving party may submit a concise reply in the form prescribed in section N for a response. All material facts set forth in the statement filed pursuant to section N(3)(b) will be deemed admitted unless controverted by the statement of the moving party.

Nothing in that paragraph (or anywhere else in GR 12(M) or 12(N)) gives the moving party a second chance to fortify its own GR 12(M)(3) statement of facts, and neither will this Court. Of course defendants' responses to GR 12(N) ¶¶ 35 through 44 are appropriate under GR 12(M) because those paragraphs serve as Viero's GR 12(N)(3)(b) statement of additional facts, and thus defendants' replies to those paragraphs are within the bounds of GR 12(M).

Second, some of defendants' exhibits are inappropriate last-minute attempts to bolster the record in their favor. It is not always problematic—though in most instances it is futile [11]—for defendants to support their re-

---

**9.** From this point forward this opinion will adhere to the conventional and convenient (although technically imprecise) practice of referring to the Eighth Amendment (which of course imposes limitations only on the federal government) rather than more accurately to the Fourteenth Amendment (which applies to state actors but has been construed to embody Bill of Rights guaranties).

**10.** Without explaining on what theory they are entitled to do so, defendants say (D.R. GR 12(M) at 1 n. 1) that they are "treating plaintiff's entire

March 29, 1996 pleading as a Rule 12(n) statement of additional facts."

**11.** Once Viero has pointed to evidence that puts a material fact at issue, of necessity defendants are not helped by mustering evidence to counter Viero's evidence. For example, once Viero has sworn in her affidavit that she had a phone conversation with Brooks about Rosario's Ritalin prescription, Brooks' affidavit swearing that the conversation did not take place does absolutely no good in moving defendants toward summary judgment. Dueling affidavits are a matter for a

sponses to Viero's GR 12(N)(3)(b) statement with additional facts. That is, if Viero has raised an issue not dealt with by defendants in their initial filing, it is appropriate for defendants to support their final response with properly admissible evidence. D.Exs. 9 (Janice Shallcross Aff.), 10 (Department's Medical Information Form), 11 (Transcript of Dispositional Proceeding), 13 (Bufano Aff.), 17 (Little Aff.) and 19 (Brooks Aff.) are therefore appropriate because they respond to issues raised for the first time by Viero's submission.

By contrast, several other exhibits are impermissible efforts to beef up the record that defendants had made (or failed to make) in their opening salvo.[12] Implicit in Rule 56— as well as in its local procedural implementation embodied in GR 12(M) and 12(N)—is the notion that the movant gets to take its best shot at showing that there is no genuine issue of material fact, and the nonmovant then gets its best shot to show that genuine issues of material fact do indeed exist. Movant then gets one last chance to respond to what the nonmovants have added. And particularly where (as here) discovery has been closed before Viero's responsive materials were due to be filed,[13] it was incumbent on defendants to apprise Viero of everything that she had to deal with in evidentiary terms *before* that due date (though in this instance that would have required defendants' supplementation of their original submission).

Defendants have disregarded all of that by attempting to add facts in their reply that could have been offered in their initial filing. D.Ex. 12, an affidavit from child psychiatrist Dr. John Costigan, is perhaps the most egregious example. Dr. Costigan there offers his opinion—based on his reading of the typed and handwritten Hartgrove discharge summaries, the Zafiris letter and the Hartgrove intake form—that there was not a strong likelihood that Rosario would attempt suicide (Costigan Aff. ¶ 9). While such an opinion is relevant to that issue, its being offered at this late point is unacceptable. Why was Dr. Costigan's affidavit not offered as part of defendants' initial filing, when they made their first effort at showing the absence of such a strong likelihood of suicide? Or at a minimum, why was it not tendered sufficiently in advance of Viero's filing date to give her the opportunity to counter that view?

One potential answer may be lack of preparation.[14] Another is sandbagging—by reserving Dr. Costigan's opinion until Viero had no ability to respond, defendants avoided having Dr. Costigan deposed and did not give Viero the opportunity to find her own expert to offer an opinion on the likelihood-of-suicide issue. Whatever the case may be, any consideration of Dr. Costigan's affidavit would involve a one-sided and unfair analysis, where Viero would be left without an opportunity to respond to Dr. Costigan's opinion. Trial by ambush is the stuff of Hollywood or TV movies, and it was once a recognized part of the sporting (or "fox-hunt") theory of justice, but today it has no place in a court of law, and particularly not in the well-ordered world of summary judgment motions. This Court will not consider Dr. Costigan's affidavit in ruling on the current motion.

That is also true of Hanchett's affidavit (D.Ex. 18), which states that he was the crisis team leader when Rosario was admitted on January 21, 1993, that he spoke with Gibson about Rosario's affirmative answers on the intake form, and that although he cannot recall the information on Rosario's

---

factfinder at trial, not for this Court at the summary judgment stage.

**12.** D.Exs. 14 (portions of Bufano's deposition) and 15 (portions of Little's deposition) were already in the record because they were submitted in their entirety by Viero and need not be addressed.

**13.** Defendants had filed their motion back in January 1996, when discovery was still materially incomplete. In accordance with Rule 56(f) this Court then afforded Viero's counsel the op-

portunity to pursue the further discovery that was deemed necessary to respond to defendants' potentially dispositive summary judgment motion.

**14.** That seems to be a likely answer: Dr. Costigan's affidavit is dated April 23, 1996, almost three weeks *after* the initial due date for defendants' own reply filing, and well over three months after defendants had made their initial filing.

suicide he believes that the form accurately reflected his opinion at the time that Rosario was "not in crisis." Defendants made that an issue in their original GR 12(M) filing, and once again there is absolutely no reason why the affidavit was not offered as part of defendants' original papers (or at worst, well before Viero had to respond). It too will not be considered.

Most of Gibson's affidavit warrants like treatment. Insofar as it sets out Gibson's story about his opinion of the suicide risk posed by Rosario when he entered St. Charles, like the Hanchett affidavit it should have been offered before and will not be considered here. On the other hand, the portions of Gibson's affidavit that concern Viero's visits to St. Charles will be taken into account, because that information really did not become relevant until Viero advanced her contention that she had gone to St. Charles soon after Rosario was admitted.

Now the procedural underbrush has been cleared away. This opinion can finally turn to the substance of defendants' arguments.

### Section 1983 Prima Facie Case

■ Under the Eighth Amendment's prohibition of cruel and unusual punishment,[15] it is unconstitutional for prison officials to display deliberate indifference to a "substantial risk of serious harm to an inmate" (*Farmer v. Brennan*, — U.S. —, —, 114 S.Ct. 1970, 1974, 128 L.Ed.2d 811 (1994)). That includes deliberate indifference to the inmate's "serious medical needs" (*Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)), which in turn includes the strong likelihood that the inmate will attempt suicide.[16] Two main areas of inquiry are involved here:

1. Did Rosario have a serious medical need, including a need to be protected (from himself) because of a strong risk that he would attempt suicide?
2. Were the officials deliberately indifferent to that serious medical need?

*Serious Medical Need*

■ Of those two inquiries the former is the more straightforward—it requires proof[17] of the existence of a serious medical need. Because that is an objective threshold inquiry, at this stage of the analysis this Court is not limited to the materials that were available to the defendants. Instead all evidence in the record can be considered.

Viero has two different (but possibly related) paths available to her on this issue. Each requires some amplification.

First, Viero can show that Rosario had medical needs of sufficient severity to be cognizable for Eighth Amendment purposes. *Partee v. Lane*, 528 F.Supp. 1254, 1260 (N.D.Ill.1981) says this about the line between "serious" and "non-serious" medical needs:

> That a medical need is "serious," for the purpose of a section 1983 action, can be established either by showing that a physician has diagnosed it as mandating treatment or by demonstrating that the condition was so obvious that even a lay person would recognize the necessity of a doctor's attention.

There is ample evidence in the record to support an affirmative finding as to the seriousness of Rosario's medical needs. Dr. Newman noted in the handwritten discharge

---

**15.** Although Viero's Complaint speaks of the Fourth, Fourteenth and Eighth Amendments, this case clearly presents Eighth Amendment questions. No "seizure" is at issue here that would implicate the Fourth Amendment, and it is well established that the Fourteenth Amendment protects pretrial detainees while the Eighth Amendment protects convicted prisoners (propositions reconfirmed by our Court of Appeals just last week in *Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir.1996)). Having already been adjudged delinquent and committed to Department, Rosario clearly fell into the latter category.

**16.** Although neither the Supreme Court nor our own Court of Appeals has expressly recognized a prisoner's right to be protected from self-inflicted harm, several other Courts of Appeals have extended the Supreme Court's Eighth Amendment analysis to prisoner suicide cases (e.g., *Torraco v. Maloney*, 923 F.2d 231, 235–36 (1st Cir.1991), *Bell v. Stigers*, 937 F.2d 1340, 1342–43 (8th Cir. 1991) and cases cited in each).

**17.** Of course all that Viero needs to do at this pleading stage is to show the existence of a disputed issue of material fact. She need not "show" or "prove" anything.

summary that Rosario was to continue to take 10 milligrams of Ritalin three times per day upon his discharge from Hartgrove (D.Ex. 4 at 3). Indeed, Dr. Newman noted that the Ritalin prescription (along with therapy) represented a course of treatment that enabled Rosario to make some strides against his behavioral problems. Dr. Cerniak indirectly validated the seriousness of Rosario's need in that respect when the Ritalin prescription alone prompted him to refer Rosario to a psychiatrist (V.Ex. 4).

■ Moreover, there is surely record evidence from which it could reasonably be inferred that Rosario had a serious need for ongoing treatment from mental health professionals. It is well-established that mental health needs are within the category of serious medical needs recognized by the Eighth Amendment (*Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir.1983)). As already noted, it was a combination of Ritalin and therapy that enabled Rosario to make enough progress to be discharged from Hartgrove. It almost defies common sense to think that a 14 year old with behavioral problems that were sufficiently serious to merit hospitalization for over a month, coupled with intense therapy, could be shut off cold turkey and placed in a youth correctional facility without further mental health counseling. Zafiris' letter makes an express recommendation that Rosario should continue individual and family therapy (D.Ex. 5). And even Dr. Cerniak felt that Rosario needed to be referred to a psychiatrist (Viero Ex. 4). Surely a factfinder could reasonably conclude that Rosario had serious medical needs both for

the Ritalin that was prescribed to him and for continued mental health treatment.

■ Alternatively [18] Viero can show that there was a "strong likelihood" that Rosario would attempt suicide (*Torraco*, 923 F.2d at 235–36). "Strong likelihood" is distinct from "a mere possibility" (*State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir.1983)), but whether an inmate presents a risk of suicide substantial enough to qualify as a "strong likelihood, rather than a mere possibility" is a factual determination that must be made on a case-by-case basis. Factors to consider in deciding whether there was a "strong likelihood" that an inmate might attempt suicide include (but obviously are not limited to) threats to commit suicide, attempts to commit suicide, the receipt of psychiatric or psychological counseling, displays of agitated, hysterical or other unusual behavior, and prior nervous breakdowns (*Bell*, 937 F.2d at 1344).

It cannot be said as a matter of law that the record would not support a rational finding that there was a strong likelihood that Rosario would attempt suicide. Rosario admitted on at least two occasions (both to Dr. Newman and to Little during the suicide screening) that he previously had thoughts of harming himself. Dr. Newman's typed discharge summary of January 19, 1993 noted that Rosario was "tearful and very despondent" when he learned that his mother was pressing charges against him and that incarceration was likely, and it takes no great leap to infer that those feelings lingered when incarceration actually occurred (V.Ex. 2 at 3).

18. Defendants miss the point that there are potentially two independent paths to recovery here (though they must be shown to be causally related if Viero is to maximize such recovery). For instance, D.R.Mem. 9 argues that because "Ritalin is not to be prescribed for an adolescent diagnosed as suffering from major depression," defendants' failure to ensure that Rosario received Ritalin could not have led to his suicide. *That may perhaps be so (although defendants have offered no evidence to support their assertion), but such reasoning perpetuates a mistake made by defendants throughout their filings. Two possible grounds for liability exist here: defendants' failure to ensure that Rosario's serious medical needs were met, and defendants' failure to protect Rosario from committing suicide. Defendants do not recognize that the former need

not be related to the latter for Viero to recover under Section 1983 (though the measures of damages would be very different). On the one hand Viero could argue that the reason Rosario committed suicide was that he was mentally unstable because he had not been given Ritalin, nor had he been given access to any mental health professionals since he arrived at St. Charles. But Viero could also independently argue that defendants' failure to ensure that Rosario received Ritalin and had mental health counseling caused harm to him independent of his suicide. Of course any recovery on the latter theory would be limited to the harm suffered by Rosario without regard to his suicide (e.g., pain and suffering), but she could recover on that theory nonetheless.

Additionally, Rosario had been in a psychiatric hospital for 33 days before being committed to St. Charles, which is at least evidence of psychological instability. While the evidence is certainly not conclusive, a reasonable jury could determine that there was a strong likelihood that Rosario would attempt suicide. That is a fact-specific determination, one that the factfinder is better suited than this Court to make.

Because there are thus questions of fact as to whether Rosario had a serious medical need for the prescribed Ritalin and for mental health counseling and as to whether there was a strong likelihood that Rosario would attempt suicide, defendants' call for summary judgment on those grounds must be rejected. It is necessary, then, to turn to the "deliberate indifference" portion of the analysis.

*Deliberate Indifference*

*Estelle* and *Farmer* do not allow for recovery in situations such as this one unless the defendants displayed deliberate indifference to Rosario's serious medical needs or suicidal tendencies (*Popham v. City of Talladega*, 908 F.2d 1561, 1563–64 (11th Cir.1990) (per curiam)). As *Farmer*, —— U.S. at —— – ——, 114 S.Ct. at 1978–80 pointed out, the Eighth Amendment standard is roughly equivalent to the notion of "recklessness" in the criminal law context. Deliberate indifference is thus a mental state beyond mere negligence, requiring a showing of conscious disregard of a known risk or condition. It contains both a subjective inquiry (*id.* at ——, 114 S.Ct. at 1979) (did the official know[19] of the risk or condition?) and an objective inquiry (*id.* at —— – ——, 114 S.Ct. at 1982–83) (did the official take reasonable steps in response?). So for Bufano, Little or Brooks to be held liable, he or she must have known of Rosario's serious medical needs or strong suicidal tendencies (or both) and must have acted in conscious disregard of that need or risk by failing to take reasonable steps in response.

Defendants urge that neither Bufano nor Little knew that there was a strong likelihood that Rosario would attempt suicide. As for Brooks, they contend that he cannot be held liable because he was not "personally involved" with Rosario's case. This opinion will consider each defendant's arguments in turn.

*1. Bufano*

Bufano insists that she did not know that there was a strong likelihood that Rosario would attempt suicide. She points to the fact that none of the hospital personnel she interviewed indicated that Bufano posed a suicide risk, and she also contends that neither the handwritten discharge summary nor the Zafiris letter says anything about Rosario being a suicide risk. Finally she also asserts that because Viero had not signed a release for her to obtain Rosario's medical records at Hartgrove, she was precluded from accessing any information that might have revealed that Rosario was a suicide risk.[20]

But all of that impermissibly ignores the fact (and it *is* a fact for purposes of the present motion) that Viero specifically warned Bufano that Rosario needed to be watched closely because of his previous threats of suicide (Viero Aff. ¶ 8–9). Bufano's only purported counter to that is that Viero neither said such things to her nor tried to give Bufano Rosario's Ritalin prescription. But elementary summary judgment principles reject the notion that this sort of "you did/I did not" exchange can be resolved at the summary judgment stage. Bufano tells one story and Viero tells another, and the decision about who is telling the truth is for the factfinder after hearing all the evidence, not for this Court on a paper

**19.** *Farmer, id.* at ——, 114 S.Ct. at 1981 (citation omitted) elaborated on the "knowledge" ingredient:

Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

**20.** That last argument need not be addressed, because the information that Bufano *did* have would permit a reasonable jury to find that she knew of Rosario's serious medical needs and strong suicidal tendencies.

record.[21] For Rule 56 purposes it must be accepted that Viero put Bufano on notice that Rosario was a substantial suicide risk.[22]

As for Viero's prospect of a lesser recovery (see n. 18), Bufano is not entitled to summary judgment because a jury could reasonably conclude that Bufano knew that Rosario had serious medical needs. She was well aware that Rosario had spent 33 days in Hartgrove, and she knew from the handwritten discharge summary and from Zafiris' letter that Rosario was supposed to continue taking Ritalin and to receive mental health counseling after being discharged. And it will be recalled that Viero tried to give Rosario's Ritalin prescription to Bufano, something that a jury could view as buttressed by Bufano's own admission that she knew Rosario was supposed to continue taking Ritalin upon discharge (Bufano Dep. 45–47).

That then leads to the objective question of whether Bufano took reasonable steps in response to Rosario's medical needs and suicidal tendencies. All she did was to forward the packet of information to Department. Bufano claims that alone was enough—that she did all she needed to do and therefore should not be held responsible for anything that later happened to Rosario. But is that the only rational answer to the question of what a reasonable person would have done in the circumstances? Bufano did nothing whatever to call attention to the facts (that must now be treated as having been known to her) that Rosario presented a suicide risk or had special needs for medication and counseling. She did not, for example, draft a cover letter to go with the package or make any contact—written or oral—with anyone at Department. Because a reasonable jury could find that Bufano was aware of Rosario's serious medical needs and suicide risk but that she did not take any such reasonable steps in response, Bufano is not entitled to summary judgment.

## 2. *Little*

In most respects Little's position parallels Bufano's: Her central assertions are that she did not know that Rosario posed a serious risk of suicide, and even if she did she took reasonable responsive steps. At the core of her argument is the contention that Rosario's two affirmative responses on the suicide screening questionnaire were just not enough to tip her off that Rosario posed a strong suicide risk.

Suffice it to say that a reasonable jury could come out the other way on that issue, as well as on the question whether Little knew that Rosario had serious medical needs. Recall that Rosario gave an affirmative answer to "Have you ever thought about hurting yourself?" Moreover, Rosario told Little that he was taking a "sm. white pill for nerves." Little's writing on the suicide screening form that Rosario last took the pill "@ Hosp." shows that she knew Rosario had been in the hospital (see also Viero Dep. 45). Finally and importantly, Viero must now be believed as to her phone conversation with Little during which she told Little of her "worries about [Rosario], his depression, his needs for medication for hyperactivity" and Rosario's "previous ideas of committing sui-

---

**21.** It is really inexcusable for defendants to sound the repeated refrain that "plaintiff's assertions are not material as she has made no showing through competent, admissible and probative evidence." Viero's assertions are made in an affidavit, which under Rule 56(e) is certainly competent, admissible and probative. It is entirely beside the point that defendants do not believe Viero. They inexplicably chose not to depose Viero (something that sometimes leads to a court's rejection of inconsistent statements in an affidavit), and so her affidavit is unimpaired for Rule 56 purposes.

**22.** Bufano points out that Viero was silent when asked if there was "something you would like to say" at the delinquency hearing—Viero then replied, "I just agree with Diane [Bufano]" (D.Ex.

11 at 9). Bufano contends that if Viero had been really worried about Rosario's mental state and believed that Rosario was a suicide risk, she would have said something more at that time. But is the only permissible inference the highly unfavorable one that because Viero failed to stand before whoever happened to be in the courtroom—including Rosario himself—and disclose her understandably delicate concerns that Rosario was a suicide risk, she did not really think he *was* a suicide risk and thus did not voice her concerns to Bufano? When as now all reasonable inferences are to be drawn in Viero's favor, Viero's silence at the delinquency hearing cannot alone discredit her sworn statement that she later expressly told Bufano that Rosario was a suicide risk.

cide" (Viero Aff. ¶ 11). Taken together, those ingredients could support a reasonable inference that Little knew about both Rosario's propensity for suicide and his serious medical needs.[23]

That leads, then, to the objective question: Did Little take reasonable steps in light of that reasonably-inferred knowledge of Rosario's potential for suicide and his medical needs? Like Bufano, Little urges that she did all that was required of her when she checked the boxes on the bottom of the suicide screening questionnaire to indicate that Rosario should be referred to a mental health professional and to the crisis team leader.

Was that enough? That too is a question that a reasonable jury could answer in the negative. Little cannot recall if she asked any follow-up questions during the suicide screening (Little Dep. 30–31, 36–37). She does not disclaim her failure to ask, for example, "Which hospital?" or "Why were you in the hospital?" when Rosario told her he had last taken a small white pill for nerves at the hospital two days earlier.[24] Any deeper questioning in that respect would presumably have disclosed the incorrectness of Rosario's negative answer to the question "Have you ever been in a psychiatric hospital?" Similarly, Little apparently did not follow up on the inconsistency between Rosario's admission that he had taken medication for "nerves" and his contention that he was not feeling "sad, unhappy, upset, irritable, anxious." Those two responses are facially inconsistent, yet there is no indication that Little probed more deeply. Any information that she might have gleaned from further questioning and then recorded on the suicide screening questionnaire could well have affected an ultimate decision to put Rosario into the observation unit instead of into the general population.

Little also admits that she did not look at the packet of information prepared by Bufano, even though she "supposes" the packet was available to her (Little Dep. 39). Her reason for not looking at the materials was that she "was not the admitting counselor" (*id.*). Little also does not remember whether she orally relayed any information about Rosario to Gibson when she gave him the form, or whether she took any affirmative steps to see that Rosario either saw a mental health professional or received his medication (Little Dep. 30). Any or all of those things would seem to have been reasonable to do under the circumstances, but Little did not do any of them.

To summarize, a reasonable jury could also find that Little knew of Rosario's medical needs and suicide risks but did not act reasonably in response. Thus she too is not entitled to summary judgment.

### 3. *Brooks*

■ Section 1983 does not impose vicarious liability on supervisors for constitutional torts committed by employees under their watch (*Monell v. Department of Social Serv.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)). Hence Brooks cannot be liable for the deprivation of Rosario's Eighth Amendment rights unless he personally knew of Rosario's serious medical needs or of the strong likelihood that Rosario would attempt suicide and unless he was nevertheless deliberately indifferent to those matters.[25]

---

**23.** It is not wholly irrelevant that a factfinder could reasonably consider that Rosario's answers as recorded on the suicide screening questionnaire cried out for such follow-up questions as "Why were you taking nerve pills?" or "Which hospital were you in and why?" Although *Farmer*, —— U.S. at ——, 114 S.Ct. at 1979 instructs this Court to look only at what Little knew—as opposed to what she should have known—in carrying out the deliberate indifference analysis, the fact that Rosario's answers can leave an objective reader with the view that more should have been asked may constitute evidence that Rosario's suicide risk and medical needs were obvious (*id.* at ——, 114 S.Ct. at 1981).

**24.** No finding is of course made here to whether Little did or did not ask follow-up questions, and her response that she does not remember whether she did is credited for purposes of the present motion. All that can be said on the subject is what has been set out in the text, plus the fact that the suicide screening form contains no additional questions or responses.

**25.** Complaint ¶ 11(d) asserts that Brooks "failed to establish and enforce adequate procedures to assure that detainees with a risk of suicide were adequately medicated, evaluated, counseled, supervised and observed," a contention also advanced in Viero's Memorandum. Al-

Viero admits that Brooks, effectively the chief administrative officer at St. Charles, was not personally involved in the care or supervision of Rosario (V. 12(N) ¶ 32). But Viero says (and it must now be accepted) that she had a phone conversation with Brooks that put Brooks on notice of Rosario's serious medical needs. During that conversation Viero told Brooks that Ritalin had been prescribed for Rosario at Hartgrove for a "nerve problem," that personnel at St. Charles refused to take Rosario's Ritalin prescription when Viero tried to bring it to St. Charles within a week after Rosario arrived there, and that she was worried about Rosario (Viero Aff. ¶ 15). Brooks then responded, "We'll take care of everything, don't worry about it" (id.). Brooks denies any such conversation (Brooks Aff. ¶ 2), and he also offers records from St. Charles that allegedly show that Viero did not visit Rosario until February 16, 1993 (D.Ex. 16).

Unlike the earlier discussion as to the other two defendants, Viero has provided no evidence (even with the most favorable inferences) that Brooks knew that there was a strong likelihood that Rosario would attempt suicide. Viero told Brooks only that she was worried about Rosario and that he was taking Ritalin for a "nerve problem," statements that cannot reasonably lead to an inference that Brooks knew Rosario was a suicide risk at all. Viero's argument that Brooks' conversation with Viero should have prompted Brooks to look at Rosario's file, which in turn would have shown Brooks that Rosario was a suicide risk, gives new meaning to the term "attenuated." At any rate, liability in prison suicide cases cannot be imposed unless there was knowledge of the risk, and clearly Brooks did not even arguably have any actual knowledge that Rosario posed a strong risk of suicide.

On the other hand, a reasonable jury could surely find that Brooks knew that Rosario had serious medical needs, specifically the need to receive the Ritalin that had been prescribed to him. That is a reasonable

inference from Viero's account of her telephone conference with Brooks.

Brooks' response that he did not have a conversation with Viero, and his offer of proof that Viero did not try to visit Rosario at St. Charles until mid-February (the latter to controvert her claim that she tried to bring Rosario his pills in January), do not change the outcome. This is a classic example of contested facts: Viero tells one story and Brooks tells another. Such issues of fact must be decided by the factfinder, not by this Court on a motion for summary judgment.

Brooks' entire submission has been built around the contention that he had no knowledge of Rosario's medical problems—he offers no evidence that he did anything in response to the knowledge that could be ascribed to him. Thus Brooks does not claim that he personally looked into whether Rosario had ever received medication, or that he ordered one of his subordinates to do so, or even that he looked at Rosario's file.

By definition Brooks could not have been deliberately indifferent to a strong likelihood that Rosario would attempt suicide, for as already stated Viero has presented no evidence that Brooks knew that Rosario *was* a suicide risk. But on the other possible basis for a lesser recovery under Section 1983, a reasonable jury could find that Brooks knew of Rosario's need to receive the Ritalin that was prescribed to him but did nothing to look into the problem that Viero had pointed out to him. Thus Brooks' motion for summary judgment must also be denied, at least as to the lesser portion of Viero's claim.

### Qualified Immunity

■ In addition to urging that they are entitled to summary judgment on the facts, defendants also renew their argument that they are sheltered from liability by qualified immunity. Given the lack of effort put forth by defendants in that respect—they have

---

though supervisors can be held liable for deliberate indifference to flaws in the system that lead to a constitutional violation (e.g., *Greason v. Kemp*, 891 F.2d 829, 836–40 (11th Cir.1990)), Viero does not cite to anything in the record to

support such a theory. Instead she focuses on the theory (discussed in the text) that Brooks knew of Rosario's medical needs but failed to take adequate steps in response.

simply repeated virtually word for word[26] the argument previously rejected by this Court (Opinion at 1394–95)—this opinion will not take much time in shooting it down again.[27]

In thus renewing their qualified immunity argument, defendants miss the very point that caused them to lose the first time around. Let's try again. At the time of occurrence of the events that form the basis of Viero's claim (between January 1993 and March 1993), the cases discussed in the *Section 1983 Prima Facie Case* section of this opinion had clearly established that the Eighth Amendment prohibits prison officials from being deliberately indifferent to a prisoner's serious medical needs, including a strong risk of suicide. Defendants do not really dispute that, asserting instead (D.R.Mem. 16):

> The record shows that at the time of the defendants' conduct there were no previously closely analogous cases putting them on notice that each's particular conduct violated John Rosario, Jr.'s clearly established statutory or constitutional rights.

This argument is futile, however, because once defendants concede that the law is "clearly established" and that the plaintiff must prove deliberate indifference, the issue becomes fact-intensive and any concept of qualified immunity falls out of the equation.

■ In its most basic form, qualified immunity means that state actors will not be held liable if their actions were objectively reasonable (*Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987)). As already stated, the then-settled state of the law told defendants that they could not be deliberately indifferent to Rosario's medical needs and suicidal tendencies if they had knowledge of those facts— they had to take *reasonable* steps in response. How, then, was if possible for defendants to be objectively "reasonable" if they did *not* take the required reasonable steps in response to an inmate's serious medical needs or risk of suicide?

If a plaintiff has the potential to convince a rational factfinder through the available evidence that a defendant knew of an inmate's serious medical needs or strong suicidal tendencies and did not take reasonable steps in response, that defendant is entitled neither to summary judgment nor to qualified immunity. If however the plaintiff cannot show deliberate indifference in those terms, then defendant wins on the facts and does not need qualified immunity.

■ In other words, qualified immunity is a non-factor in Section 1983 cases where plaintiffs must prove deliberate indifference. As aptly summarized in *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir.1992):

> A finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who *deliberately* ignore the serious medical needs of the inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law.

Defendants lost their qualified immunity argument as soon as this Court found that a reasonable jury could infer that they were deliberately indifferent to Rosario's needs.

---

**26.** Defendants did at least take the trouble to change the end of the last sentence of their motion from "should be dismissed with prejudice" to a current contention that they are "entitled to summary judgment." That, along with the correction of a typo and the combination of two paragraphs, are the only changes they have made. At a minimum, responsible counsel might have been expected to address this Court's reasoning when it rejected the selfsame contention that defendants earlier advanced in their motion to dismiss. In this instance counsel have not even acknowledged that this Court *had* previously rejected their contention.

**27.** Section 1983 defendants can, of course, get two bites at the qualified immunity apple (see

*Behrens v. Pelletier,* —— U.S. ——, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)). Because of the lack of factual development at the motion to dismiss stage, it is sometimes difficult to establish at that point that defendants are entitled to qualified immunity. By the time that discovery has taken place, defendants may be better equipped to argue, and a court may be in a better position to determine, that summary judgment is appropriate on that ground. But as the discussion in the text explains, this is not a case in which more factual development has improved defendants' chances to get qualified immunity. Instead their purely repetitive course of action here seems quite mindless.

That same argument must again be rejected at this stage.

### Quasi–Judicial Immunity

■ Bufano's claim that she is entitled to quasi-judicial immunity is also a warmed-over version of the position that Opinion at 1395–96 rejected in response to her motion to dismiss At that time this Court said (*id.* at 1396):

> It is difficult to see how Bufano's failure to assure that Rosario received his medication and her failure adequately to communicate information as to Rosario's mental health has anything to do with the judicial process.

Bufano has added nothing here to change that view. Again her counsel have not even seen fit to address the earlier ruling directly—her submissions do not refer at all to the Opinion. But at least *something* has been added this time (unlike defendants' bizarre handling of the qualified immunity issue), so this opinion will speak to that addition.

This time Bufano attempts to fortify her argument that her actions at issue in this suit occurred when she was acting pursuant to the orders of Judge May. But that really isn't true. While it may be accurate to say that Bufano's knowledge of Rosario's serious medical needs and suicidal tendencies was obtained (at least in part) in the course of her compiling the supplemental social investigation, it is her failure *to act* on that knowledge that forms the basis of Viero's claim.

To put matters a bit differently, it does not really matter how Bufano became aware of Rosario's serious medical needs, for Viero's claim is rather that once Bufano had that knowledge she did not take reasonable steps in response. In other words, Viero does not say that Bufano acted unconstitutionally in the course of carrying out Judge May's orders to compile the supplemental social investigation [28]—instead she claims that Bufano acted unconstitutionally in another part of her job as a probation officer, that of conveying (or not conveying) important information about Rosario to Department. Hence Bufano's actions at issue here were neither (*Walrath*, 35 F.3d at 281):

> closely analogous to the adjudicative functions of a judge, [nor] "intimately associated" with the judicial process itself. . . .

Once again Bufano is therefore not entitled to quasi-judicial immunity.

### Conclusion

Viero has established that there are genuine issues of material fact as to whether each defendant violated Rosario's Eighth Amendment rights by being deliberately indifferent to his serious medical needs and (except as to Brooks) to the strong likelihood that he would attempt suicide. This Court also rejects defendants' arguments that they are entitled to qualified immunity and that Bufano is entitled to quasi-judicial immunity. Defendants' motion for summary judgment is therefore denied, though the limitation on the claim against Brooks described earlier will be dealt with in the jury instructions at trial.

---

**28.** Imagine, on the other hand, a situation where in the course of compiling a supplemental social investigation Bufano had included a false statement that significantly harmed a youth's reputation (for this purpose it will be assumed that the injury meets the stigma-plus requirement of *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). In such a case qualified immunity might protect Bufano from liability for any due process violation because the alleged constitutional violation would have occurred while Bufano was acting as an arm of the court. That hypothetical situation, and not the facts of this case, is analogous to the cases cited by Bufano where quasi-judicial immunity was granted to a probation officer (*Spaulding v. Nielsen*, 599 F.2d 728, 729 (5th Cir.1979) (per curiam)), court reporters (*Scruggs v. Moellering*, 870 F.2d 376, 377 (7th Cir.1989); *Dellenbach v. Letsinger*, 889 F.2d 755, 762–63 (7th Cir.1989)) and parole board members (*Walrath v. United States*, 35 F.3d 277, 281–84 (7th Cir.1994)).